**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(GREENBELT DIVISION)**

| | |
|---|---|
| JEFFREY R. GAHLER, in his official capacity as Sheriff of Harford County, Maryland, and in his individual capacity; | |
| SCOTT A. ADAMS, in his official capacity as Sheriff of Cecil County, Maryland, and in his individual capacity; | |
| BRIAN K. ALBERT, in his official capacity as Sheriff of Washington County, Maryland, and in his individual capacity; | |
| DONALD L. BAKER, JR., in his official capacity as Sheriff of Caroline County, Maryland, and in his individual capacity; | |
| RICHARD T. (RICKY) COX, JR., in his official capacity as Sheriff of Calvert County, Maryland, and in his individual capacity; | Civil Action No.  8:26-cv-02057 |
| MATTHEW CRISAFULLI, in his official capacity as Sheriff of Worcester County, Maryland, and in his individual capacity; | |
| JAMES T. DeWEES, in his official capacity as Sheriff of Carroll County, Maryland, and in his individual capacity; | |
| JOSEPH J. GAMBLE, in his official capacity as Sheriff of Talbot County, Maryland, and in his individual capacity; | |
| STEVEN A. HALL, in his official capacity as Sheriff of St. Mary's County, Maryland, and in his individual capacity; | |
| DENNIS W. HICKMAN, JR., in his official capacity as Sheriff of Kent County, Maryland, and in his individual capacity; | |

R. GERY (GARY) HOFMANN III, JR., in his official capacity as Sheriff of Queen Anne's County, Maryland, and in his individual capacity;

RONALD W. HOWARD, in his official capacity as Sheriff of Somerset County, Maryland, and in his individual capacity;

CHARLES A. (CHUCK) JENKINS, in his official capacity as Sheriff of Frederick County, Maryland, and in his individual capacity;

MICHAEL A. LEWIS, in his official capacity as Sheriff of Wicomico County, Maryland, and in his individual capacity;

BRYSON MEYERS, in his official capacity as Sheriff of Garrett County, Maryland, and in his individual capacity;

JAMES W. PHILLIPS, JR., in his official capacity as Sheriff of Dorchester County, Maryland, and in his individual capacity; and

CRAIG A. ROBERTSON, in his official capacity as Sheriff of Allegany County, Maryland, and in his individual capacity,

Plaintiffs,

v.

WES MOORE, Governor of the State of Maryland, in his official capacity;

ANTHONY G. BROWN, Attorney General of the State of Maryland, in his official capacity;

THE STATE OF MARYLAND,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Sheriffs Jeffrey Gahler, Scott Adams, Brian Albert, Donald Baker, Richard Cox, Matthew Crisafulli, James DeWees, Joseph Gamble, Steven Hall, Dennis Hickman, Gery Hofmann, Ronald Howard, Charles Jenkins, Michael Lewis, Bryson Meyers, James Phillips, and Craig Robertson' ("Plaintiffs"), in both their official and individual capacities, bring this action against Maryland Governor Wes Moore, Maryland Attorney General Anthony Brown, and the State of Maryland ("Defendants") for declaratory and injunctive relief, and allege as follows:

**INTRODUCTION**

1. Upon assuming office on January 20, 2025, President Donald J. Trump issued Proclamation 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 29, 2025). This declaration addressed conditions created before President Trump took office, including anti-borders policies that incentivized disregard for laws passed by Congress. As a result, millions of illegal aliens settled in American communities in flagrant violation of federal law, resulting in "significant threats to national security and public safety," with aliens "committing vile and heinous acts against innocent Americans." Executive Order 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 29, 2025).

2. Further exacerbating this national crisis are so-called sanctuary jurisdictions that seek to provide criminal aliens with safe harbor from federal law enforcement detection. The consequences of those misguided policies are dire. Sanctuary jurisdictions welcome illegal aliens to live and work in American communities whose citizens may become victims of crimes committed by illegal aliens. This national crisis underscores the vital importance of the Executive "[e]nforcing our Nation's immigration laws." *Id.*

3

3.    The State of Maryland is one such sanctuary jurisdiction that insists on harboring criminal offenders from federal law enforcement and instructs State and local law enforcement officers such as Plaintiffs to participate in this harboring. Specifically, the Community Trust Act ("the Act"), codified at Md. Code Ann., Corr. Servs. § 8-805 and Crim. Proc. § 5-104, prohibits Plaintiffs from detaining criminal aliens at the request of the federal government, notifying federal immigration authorities that a criminal alien is in custody, sharing any information about such aliens, or transferring to federal authorities a criminal alien who is already in custody.

4.    These prohibitions intentionally obstruct federal law enforcement and thwart Plaintiffs' obligation to uphold the Constitution of the United States. Maryland's blatant defiance of federal immigration law is not merely a political disagreement or passive abstention; it is deliberate, disruptive action that jeopardizes the public safety of all Americans. The Supremacy Clause of the United States Constitution prohibits this kind of obstruction by a state or locality.

5.    Maryland Sheriffs are the chief law enforcement officers of their counties. In many jurisdictions, including those represented by Plaintiffs Gahler (Harford), Jenkins (Frederick), DeWees (Carroll), Meyers (Garrett), Robertson (Allegany), Hall (Caroline), Adams (Cecil), Albert (Washington), and Cox (Calvert), the Sheriff operates and manages the local correctional facility. In those jurisdictions, sheriffs typically supervise hundreds of deputies and correctional officers and manage facilities with hundreds of inmates. They are also responsible for judicial security and patrol operations. All Plaintiffs supervise deputies who interact with the public every day, and bear ultimate responsibility for public safety within their jurisdictions. As sworn officers, they are duty-bound to uphold both Maryland law and the Constitution and laws of the United States—including the comprehensive federal immigration enforcement scheme enacted by Congress.

6. Plaintiffs have always worked closely with federal partners to keep their communities safe. However, that cooperation—once routine and uncontroversial—has faced increasing state-imposed restrictions in recent years (including emergency legislation signed by Governor Moore in February 2026 that bans Plaintiffs from entering into 287(g) agreements with DHS).

7. The Act now forces Plaintiffs into an impossible and unconstitutional position. The Act prohibits Plaintiffs and their deputies and correctional staff from honoring federal immigration detainers, notifying federal authorities that a removable alien is in custody, transferring custody to U.S. Immigration and Customs Enforcement ("ICE"), or providing information obtained in the course of official duties—unless a narrow "judicial warrant" is presented, a requirement that expressly excludes administrative warrants issued by the Department of Homeland Security ("DHS") or the Department of Justice ("DOJ"). These prohibitions apply even to individuals convicted of serious felonies, sex offenses, or other crimes for which federal law mandates detention and removal.

8. This state mandate violates the Supremacy Clause in four distinct ways: (1) it forces Plaintiffs to engage in conduct that federal law criminalizes as harboring and other offenses such as obstruction of justice; (2) it stands as an obstacle to the accomplishment of the purposes of federal immigration law; (3) it is expressly preempted by the Immigration and Nationality Act ("INA"); and (4) it unlawfully regulates the Federal Government in violation of principles of intergovernmental immunity.

## THE PARTIES

9. Plaintiff Jeffrey R. Gahler is and has been Sheriff of Harford County, Maryland, since 2014. He brings this action in both his official and individual capacities.

10.     Plaintiff Scott A. Adams is and has been Sheriff of Cecil County, Maryland, since 2014. He brings this action in both his official and individual capacities.

11. Plaintiff Brian K. Albert is and has been Sheriff of Washington County, Maryland, since 2022. He brings this action in both his official and individual capacities.

12. Plaintiff Donald L. Baker, Jr., is and has been Sheriff of Caroline County, Maryland, since 2022. He brings this action in both his official and individual capacities.

13. Plaintiff Richard T. (Ricky) Cox, Jr., is and has been Sheriff of Calvert County, Maryland, since 2022. He brings this action in both his official and individual capacities.

14. Plaintiff Matthew Crisafulli is and has been Sheriff of Worcester County, Maryland, since 2018. He brings this action in both his official and individual capacities.

15. Plaintiff James T. DeWees is and has been Sheriff of Carroll County, Maryland, since 2014. He brings this action in both his official and individual capacities.

16. Plaintiff Joseph J. Gamble is and has been Sheriff of Talbot County, Maryland, since 2014. He brings this action in both his official and individual capacities.

17. Plaintiff Dennis W. Hickman, Jr., is and has been Sheriff of Kent County, Maryland, since 2022. He brings this action in both his official and individual capacities.

18. Plaintiff R. Gery (Gary) Hofmann III, Jr., is and has been Sheriff of Queen Anne's County, Maryland, since 2006. He brings this action in both his official and individual capacities.

19. Plaintiff Ronald W. Howard is and has been Sheriff of Somerset County, Maryland, since 2014. He brings this action in both his official and individual capacities.

20. Plaintiff Charles A. (Chuck) Jenkins is and has been Sheriff of Frederick County, Maryland, since 2006. He brings this action in both his official and individual capacities.

21. Plaintiff Michael A. Lewis is and has been Sheriff of Wicomico County, Maryland, since 2006. He brings this action in both his official and individual capacities.

22. Plaintiff Bryson Meyers is and has been Sheriff of Garrett County, Maryland, since 2022. He brings this action in both his official and individual capacities.

23. Plaintiff James W. Phillips, Jr., is and has been Sheriff of Dorchester County, Maryland, since 2002. He brings this action in both his official and individual capacities.

24. Plaintiff Craig A. Robertson, is and has been Sheriff of Allegany County, Maryland, since 2010. He brings this action in both his official and individual capacities.

25. Plaintiffs are Maryland Sheriffs who have been elected to serve as the chief law enforcement officers of their respective counties. They routinely receive and process federal immigration detainers and requests for information from ICE. Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 2-104, each Plaintiff has taken the oath prescribed in Article I, section 9, of the Maryland Constitution, which reads, in relevant part:

> I, _____, do swear, (or affirm, as the case may be,) that I will support the Constitution of the United States; and that I will be faithful and bear true allegiance to the State of Maryland, and support the Constitution and Laws thereof; and that I will, to the best of my skill and judgment, diligently and faithfully, without partiality or prejudice, execute the office of_____, according to the Constitution and Laws of this State.

26. Defendant Wes Moore is the Governor of Maryland and is sued in his official capacity. He bears responsibility for the enforcement of the Act and for ensuring compliance by state agencies and local officials.

27. Defendant Anthony G. Brown is the Attorney General of Maryland and is sued in his official capacity. He is the State's chief legal officer charged with enforcing and defending the Act, including through the civil actions authorized by the Act itself.

28. Defendant State of Maryland is a sovereign state of the United States subject to suit in federal court under the Supremacy Clause.

## JURISDICTION AND VENUE

29. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. The action arises under the Supremacy Clause (Article VI, Clause 2) of the U.S. Constitution and the INA, 8 U.S.C. § 1101 *et seq.*

30. Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant resides here and a substantial part of the events giving rise to the claims occurred here.

31. This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202, 1651, and its inherent equitable powers.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

32. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). This authority derives from the Constitution's Naturalization Clause, the Commerce Clause, and the federal government's inherent sovereign powers. *Id.*; U.S. Const. art. I, § 8, cl. 3 & 4; art. II, § 3.

33. The Constitution affords Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. It also affords the President of the United States the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

34. Exercising this authority, the federal government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *See, e.g.*,

8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396.

35. Federal immigration authorities also "have power without warrant … to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Federal immigration authorities further are authorized to issue subpoenas "concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service," and federal district courts are authorized to issue orders requiring individuals to comply with such subpoenas. *See* 8 U.S.C. § 1225(d)(4).

36. Congress has also codified basic principles of cooperation and comity between state and local authorities and the federal government. For example, federal law contemplates that removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal, but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4). Further, federal authorities must "make available" to state and local authorities "investigative resources … to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees … to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *and see id.* §§ 1226(c), 1231(a).

37. Congress further authorized state and local authorities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

38. In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

39. DHS also may request that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id.* § 287.7(d). In some circumstances DHS is statutorily required, upon request from local authorities, to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii). The INA also gives federal immigration authorities the discretion to detain an alien based on an administrative warrant for arrest. *Id.* § 1226(a). Such an alien may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

40. Congress penalized efforts to obstruct immigration enforcement by prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). In addition, Congress penalizes impeding or interfering with federal officers (18 U.S.C. § 111), concealing a person from arrest (18 U.S.C. § 1071), obstruction of justice

(18 U.S.C. § 1512(c)(2)), obstruction of federal proceedings (18 U.S.C. § 1505), and conspiracy to defraud the United States or obstruct lawful government functions (18 U.S.C. § 371).

## THE MARYLAND COMMUNITY TRUST ACT

41. On April 13, 2026, the Maryland General Assembly passed Senate Bill 791 as emergency legislation (attached hereto as Exhibit 1). The bill was enacted as the Community Trust Act and became law on May 22, 2026, without the Governor's signature. *See* Article II, Section 17(c) of the Maryland Constitution (providing that any Bill, like SB 791, presented to the Governor after adjournment of the General Assembly, "shall become law without the Governor's signature unless it is vetoed by the Governor within 30 days after its presentment"); *see also* Letter from Governor Moore to President of the Senate of Maryland, May 22, 2026, Re: Senate bills that will become law without his signature (attached hereto as Exhibit 2).

42. The Act imposes two parallel sets of prohibitions that directly regulate Plaintiffs in their official capacities. Specifically, it imposes restrictions on law enforcement agents (Md. Code Ann., Crim. Proc. § 5-104) as well as correctional facilities (Md. Code Ann., Corr. Servs. § 8-805)—both of which are under the control of Plaintiffs in their respective jurisdictions.

43. The Act defines "law enforcement agent" to mean individuals certified by the Maryland Police Training and Standards Commission but excluding agents or employees of state or local correctional facilities. During the performance of regular police functions, such agents are prohibited from:

   a.  inquiring about an individual's citizenship, immigration status, or place of birth during a stop, search, or arrest;

   b.  detaining or prolonging the detention of an individual to investigate citizenship or immigration status or based on suspicion of a civil immigration violation;

   c.  transferring an individual to federal immigration authorities unless required by federal law;

11

    d.  providing federal immigration authorities with information obtained in the course of the agent's duties unless required by a valid court order (expressly excluding documents issued by DHS, DOJ, or successor agencies); or

    e.  coercing, intimidating, or threatening any individual based on actual or perceived citizenship or immigration status (or that of family/household members or legal guardians).

*See* Md. Code Ann., Crim. Proc. § 5-104(b)(2).

44. The Act also applies to employees and agents of local correctional facilities (including the Baltimore City Detention Center and centralized booking facility). Subject to narrow exceptions for certain "convicted individuals" (defined as individuals convicted of any felony, sex offenders, and those sentenced to state incarceration, or out-of-state sentences of at least five years served), facilities and personnel are prohibited from:

    a.  inquiring about or investigating an individual's citizenship, immigration status, or place of birth;

    b.  detaining or prolonging detention to investigate status, based on suspicion of a civil immigration violation, or at the request of federal authorities unless presented with a valid judicial warrant (expressly excluding DHS/DOJ documents);

    c.  notifying federal immigration authorities that an individual is in custody unless required by a valid court order or judicial warrant;

    d.  transferring an individual to federal immigration authorities unless presented with a valid judicial warrant; or

    e.  coercing, intimidating, or threatening based on actual or perceived immigration status of the individual or any other person.

*See* Md. Code Ann., Corr. Servs. § 8-805(b)(2). The Act provides, in contrast, that State correctional facilities do what local correctional facilities are prohibited from doing; State correctional facilities *must* provide written notice to federal authorities of the release of any individual subject to an active immigration detainer within 48 hours before release. *See id.* § 8-805(c)(2).

12

45. The Act creates a private right of action for aggrieved individuals and establishes enforcement authority for the Attorney General. It provides that a court adjudicating a suit brought under the Act may issue temporary, preliminary, or permanent injunctive relief to ensure compliance with the law. *See* Md. Code Ann., Corr. Servs. § 8-805(e).

46. The Act also adds a new provision codified at Md. Code Ann., Crim. Proc. § 5-201.1, which permits judges to consider the existence of an immigration detainer when setting pretrial release or bond for felony defendants.

## FACTUAL BACKGROUND AND PLAINTIFFS' INJURY

47. Plaintiffs regularly arrest and detain aliens who are charged with both misdemeanor and felony criminal offenses. Several Plaintiffs, including Sheriffs Gahler, Jenkins, DeWees, Meyers, Robertson, Hall, Adams, Albert, and Cox, also operate and manage the local correctional facilities in their respective counties and are directly responsible for processing and responding to federal immigration detainers. In those jurisdictions, sheriffs typically supervise hundreds of deputies and correctional officers and manage facilities with hundreds of inmates. Several Plaintiffs' jurisdictions, including Frederick and Washington Counties, have received reimbursement from DOJ for the costs of incarcerating removable aliens in their correctional facilities as part of the State Criminal Alien Assistance Program ("SCAAP"). *See* 8 U.S.C. § 1231(i).

48. Plaintiffs and their agencies have long cooperated with federal immigration authorities by honoring detainers, providing notice of custody and impending releases, facilitating transfers, and sharing information. In a typical year prior to the Act, Plaintiffs' agencies received and honored dozens of ICE detainers and participated in joint task forces with federal agencies, including the 287(g) program. Such cooperation is a routine and critical part of Plaintiffs' public-safety mission.

13

49. These long-standing cooperative practices began to face increasing state-level restrictions. In February 2026, Governor Moore signed emergency legislation that prohibited the State, local governments, county sheriffs, and their agencies from entering into any "immigration enforcement agreement" with federal authorities, including the 287(g) program that had allowed local officers to be deputized to perform federal immigration functions. The law required immediate termination of all existing agreements. Press Release, Office of Governor Wes Moore, "Governor Moore Signs Legislation to Prohibit Maryland Jurisdictions from Deputizing Officers for Federal Civil Immigration Enforcement" (February 17, 2026), *available at* https://governor.maryland.gov/news/press-releases/governor-moore-signs-legislation-prohibit-maryland-jurisdictions-deputizing-officers-federal-civil; *see also* S.B. 245, 2026 Leg., Reg. Sess. (Md. 2026) (codified as emergency law prohibiting immigration enforcement agreements).

50. The Community Trust Act is the latest and most sweeping step in this progression of restrictions. Plaintiffs must now choose to either (a) violate the Act (risking state or private enforcement resulting in an injunction enforceable by penalties for contempt) or (b) comply with the Act and thereby expose themselves to federal criminal liability under 8 U.S.C. § 1324 (harboring), as well as 18 U.S.C. § 111 (impeding or interfering with federal officers) U.S.C.§ , § U.S.C.§ 1071 (concealing person from arrest), § 1505 (obstruction of a federal proceeding), 1512(c)(2) (obstruction of justice), and § 371 (conspiracy to defraud the United States or obstruct lawful government functions). Worse yet, compliance with the Act will force local jails to release individuals subject to ICE detainers back into the community instead of turning them over to federal custody. That is because obtaining a judicial warrant for each immigration hold is not operationally feasible due to time constraints and judge availability.

51. The bottom line is that compliance with the Act will increase crime across the state. This presents an impossible conundrum. If Plaintiffs follow the Act, they are effectively forced to shield removable aliens from federal custody; if they continue cooperating with ICE as they have for years, they risk state penalties and lawsuits.

**The Threat of Federal Criminal Liability**

52. The federal harboring statute makes it a crime for any "person"—a term that includes state and local officials—knowingly or recklessly to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection" an alien who "has come to, entered, or remains in the United States in violation of law" in "any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii).

53. Federal courts have interpreted the harboring provision broadly to encompass conduct that substantially facilitates an alien's ability to remain in the United States undetected. For example, the Fourth Circuit has upheld convictions for harboring where defendants provided housing and shelter to undocumented immigrants, recognizing that such assistance can constitute shielding from detection. *See United States v. Villalobos Aguilar*, 477 F. App'x 1000 (4th Cir. 2012).

54. Other circuits have similarly adopted a "substantial facilitation" test, holding that actions making it easier for an alien to remain in the United States can constitute harboring. *See United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975) (holding that "harbor" encompasses conduct that enables an alien to remain in the United States undetected, without requiring physical concealment or intent to evade authorities); *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1072 (5th Cir. 1982) (interpreting "shield from detection" and "harbor" broadly to include actions that prevent federal authorities from locating or apprehending an alien); *United States v. Rushing*, 313 F.3d 428, 434 (8th Cir. 2002) (holding that harboring includes any conduct that substantially facilitates

an alien's illegal presence, such as providing shelter or assistance that enables the alien to avoid detection); *United States v. Zheng*, 306 F. App'x 984, 989–90 (6th Cir. 2009) (affirming that providing employment, housing, and other support that makes it substantially easier for undocumented aliens to remain in the United States constitutes harboring); *United States v. DelRio-Mocci*, 672 F.3d 241, 246–48 (3d Cir. 2012) (holding that providing assistance that substantially facilitates an alien's continued illegal presence can constitute harboring).

55. These precedents demonstrate that Plaintiffs' compliance with the Act would likely expose them to federal criminal liability under 8 U.S.C. § 1324. Indeed, federal authorities have recently investigated and prosecuted law enforcement and judicial officials for harboring-style violations. Concrete examples include:

a. <u>Sheriff James R. Metts (Lexington County, South Carolina, 2014):</u> A sitting sheriff pleaded guilty to conspiracy to harbor and conceal illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(v)(I) for using his official position and county resources to shield undocumented individuals from federal detection and removal. Metts intervened on behalf of illegal aliens held in the Lexington County Detention Center who were subject to ICE detainers and immigration processing. He overrode or ignored federal detainers, arranged for their release, and used county jail resources and his authority as sheriff to prevent their transfer to federal custody—all while knowing the aliens were unlawfully present. *See* Press Release, U.S. Attorney's Office, District of South Carolina, "Former Lexington County Sheriff James R. Metts Pleads Guilty to Conspiring to Harbor and Conceal Illegal Aliens" (Dec. 30, 2014), *available at* https://www.fbi.gov/contact-us/field-offices/columbia/news/press-releases/former-lexington-county-sheriff-james-r.-metts-pleads-guilty-to-conspiring-to-harbor-and-conceal-illegal-aliens.

16

b. <u>Judge Shelley M. Richmond Joseph (Newton District Court, Massachusetts, 2018):</u> A sitting state court judge was indicted for conspiracy to obstruct justice (18 U.S.C. § 1512(k)) and obstruction of justice (18 U.S.C. § 1512(c)(2) after allegedly helping a twice-deported illegal alien evade ICE agents at her courthouse. *See* Indictment, *United States v. Joseph*, No. 1:19-cr-10141 (D. Mass. Apr. 2019), *available at* https://storage.courtlistener.com/recap/gov.uscourts.mad.209407/gov.uscourts.mad.209407.1.0_1.pdf. In April 2018, Jose Medina-Perez (a Dominican national who had been deported twice previously) appeared before Judge Joseph on state criminal charges. ICE agents were waiting in the front lobby of the Newton District Court to take him into custody pursuant to an immigration detainer. According to the federal indictment, Judge Joseph and a court officer directed Medina-Perez to leave through a rear courthouse exit, allowing him to evade the waiting federal agents. Federal prosecutors charged the conduct as obstruction of justice and conspiracy, alleging that Judge Joseph used her official position and knowledge of the courthouse layout to shield the alien from detection and arrest by ICE. Reuters, "Reprimand recommended for Massachusetts judge accused of helping man evade ICE" (November 7, 2025), *available at* https://www.reuters.com/legal/government/reprimand-recommended-massachusetts-judge-accused-helping-man-evade-ice-2025-11-07/.

c. <u>Judge Hannah Dugan (Milwaukee County Circuit Court, Wisconsin, April 2025):</u> A sitting state court judge was indicted for obstruction of a federal proceeding (18 U.S.C. § 1505) and concealing a person from arrest (18 U.S.C. § 1071) after allegedly helping a previously-deported Mexican national evade ICE agents at her courthouse. *See* Indictment, *United States v. Dugan*, No. 2:25-cr-00089, ECF No. 6 (E.D. Wis. May 13,

2025), available at https://storage.courtlistener.com/recap/gov.uscourts.wied.111896/gov.uscourts.wied.111896.6.0.pdf. An alien, Eduardo Flores-Ruiz, who was appearing before Judge Dugan on state assault charges, was the subject of an active ICE detainer. When federal agents arrived outside her courtroom to take him into custody, Dugan escorted Flores-Ruiz out a non-public side door and hallway, allowing him to leave the building and evade immediate arrest. He was later apprehended outside the courthouse. Reuters, "Trump administration's arrest of judge stirs debate over immigration courthouse enforcement" (May 13, 2025) *available at* https://www.reuters.com/world/us/trump-administrations-arrest-judge-stirs-debate-over-immigration-courthouse-2025-05-13/. A jury convicted Judge Dugan of obstructing a federal proceeding in violation of 18 U.S.C. § 1505. *See United States v. Dugan*, No. 2:25-cr-00089, ECF No. 96 (E.D. Wis. December 18, 2025), *available at* https://storage.courtlistener.com/recap/gov.uscourts.wied.111896/gov.uscourts.wied.111896.96.0.pdf.

d. U.S. Customs and Border Protection supervisor (Laredo, Texas, February 2026): A federal immigration supervisor with U.S. Customs and Border Protection was charged with harboring when it was discovered that he was living with and assisting his illegal alien girlfriend. On April 23, 2025, Homeland Security Investigations received information that Elva Edith Garcia-Vallejo, a foreign national who had overstayed her authorization, was residing with the supervisor in Laredo, Texas. The supervisor, a CBP Office of Professional Responsibility employee with law enforcement authority, was aware of her unlawful status yet continued to provide her with housing and shelter in his home, thereby shielding her from detection by federal immigration authorities.

18

*See* Press Release, U.S. Attorney's Office, Southern District of Texas, "Customs and Border Protection Supervisor Arrested for Harboring Illegal Alien" (Feb. 12, 2026), *available at* https://www.justice.gov/usao-sdtx/pr/customs-and-border-protection-supervisor-arrested-harboring-illegal-alien.

56. The current threat of prosecution is real and imminent for local law enforcement officers and sheriffs. The Trump administration has repeatedly and explicitly prioritized enforcement of § 1324 against sanctuary-style obstruction by state and local officials. Key examples include:

a. Executive Order 14287 (April 28, 2025), "Protecting American Communities from Criminal Aliens," 90 Fed. Reg. 18761 (May 2, 2025), which directs the Attorney General and Secretary of Homeland Security to pursue "all necessary legal remedies and enforcement measures," against jurisdictions and officials that obstruct federal immigration enforcement. *Id.* at 18762. The Order specifically identifies sanctuary-style policies that impede federal immigration enforcement as targets for investigation and prosecution. It instructs the Attorney General and Secretary of Homeland Security to use "all necessary legal remedies and enforcement measures to end these violations," *id.*, including nullification efforts that violate federal criminal laws, "including those prohibiting obstruction of justice (18 U.S.C. 1501 *et seq.*), unlawfully harboring or hiring illegal aliens (8 U.S.C. 1324), conspiracy against the United States (18 U.S.C. 371), and conspiracy to impede Federal law enforcement (18 U.S.C. 372)." *Id.* at 18761.

b. DOJ and DHS have issued guidance and sanctuary jurisdiction lists that designate non-cooperating jurisdictions and threaten criminal prosecution of officials who shield removable aliens. These documents explicitly warn that state and local officials who

19

shield removable aliens from detection or obstruct ICE operations will be subject to investigation and prosecution, including harboring under 18 U.S.C. § 1324 and conspiracy to commit an offense under 8 U.S.C. § 371. The guidance emphasized that "actions that impede federal efforts to enforce immigration law threaten public safety and national security. State and local jurisdictions must comply with applicable immigration-related federal laws." *See* DOJ Memorandum on Sanctuary Jurisdiction Directives (February 5, 2025), *available at* https://www.justice.gov/ag/media/1388531/dl?inline; Press Release, "DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law" (May 29, 2025), *available at* https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law; Press Release, "Justice Department Publishes List of Sanctuary Jurisdictions" (August 6, 2025), *available at* https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

57. In addition, compliance with the Act would colorably expose Plaintiffs to liability under 18 U.S.C. § 111(a)(1), which criminalizes anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a federal officer (including ICE agents) while the officer is engaged in the performance of official duties. The Supreme Court has held that the statute reaches a broad range of conduct that interferes with federal officers. *See United States v. Feola*, 420 U.S. 671 (1975), and the Fourth Circuit has emphasized that § 111 safeguards not only physical safety, but also the "functional integrity" of federal law enforcement. *United States v. Briley*, 770 F.3d 267, 274 (4th Cir. 2014). Other circuits have similarly adopted a broad reading of

§ 111. *See United States v. Gagnon*, 553 F.3d 1021 (6th Cir. 2009); *United States v. Stands Alone*, 11 F.4th 532 (7th Cir. 2021); *United States v. Melhuish*, 6 F.4th 380 (2d Cir. 2021).

58. Like the threat of liability for harboring, Plaintiffs' exposure to liability under § 111 for complying with the Act is concrete and measurable. Federal prosecutors have dramatically increased § 111 filings in the past year, up more than 40% from the end of the Biden administration. *See* Project On Government Oversight, "DHS Assault Cases Spiked to a Record High. Experts and Judges Have Raised Alarms" (February 24, 2026), https://www.pogo.org/investigates/dhs-assault-cases-spiked-to-a-record-high-experts-and-judges-have-raised-alarms; CNN, "How Immigration Agents Are Using a Once-Obscure Law to Detain American Citizens" (February 19, 2026), *available at* https://www.cnn.com/2026/02/19/us/immigration-law-18-usc-111.

59. A recent example of a § 111 prosecution in the immigration context involving a public official is the indictment of Rep. LaMonica McIver (who forcibly impeded and interfered with federal officers who were attempting to arrest a criminal alien outside the Delaney Hall Federal Immigration Facility in Newark). *See* Press Release, U.S. Attorney's Office, District of New Jersey, "Congresswoman Charged for Forcibly Impeding and Interfering with Federal Officers" (June 10, 2025), *available at* https://www.justice.gov/usao-nj/pr/congresswoman-charged-forcibly-impeding-and-interfering-federal-officers.

60. In addition to §§ 1324 and 111, compliance with the Act could colorably expose Plaintiffs to liability under other federal criminal provisions such as 18 U.S.C. § 371 (conspiracy to defraud the United States or obstruct lawful government functions), 18 U.S.C. § 1505 (obstruction of proceedings before departments or agencies), 18 U.S.C. § 1001 (false statements or concealment of material facts), and 18 U.S.C. § 1071 (concealing a person from arrest). The Fourth Circuit has

21

interpreted these statutes broadly in ways that could reach systematic non-cooperation with federal immigration enforcement. *See, e.g.*, *United States v. Arch Trading Co.*, 987 F.2d 1087, 1091 (4th Cir. 1993) (holding that § 371 reaches conspiracies that impair or obstruct lawful government functions); *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 406 (4th Cir. 1985) (holding that § 1001 covers willful concealment of material facts in matters within federal jurisdiction); *United States v. Silva*, 745 F.2d 840, 848 (4th Cir. 1984) (holding that § 1071 reaches any act of providing assistance, including food and shelter, to aid a person in avoiding detection and apprehension).

### The Imminent Loss of Federal Funding

61. DOJ's Bureau of Justice Assistance administers SCAAP funding, which is governed by Section 241(i) of the INA (8 U.S.C. § 1231(i)) and Title II, Subtitle C, Section 20301 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103-322). SCAAP reimbursements are not automatic; they are conditioned on state and local governments' cooperation with federal immigration enforcement.

62. On April 28, 2025, President Trump issued an executive order directing the Attorney General and Secretary of Homeland Security "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." § 3, Executive Order 14287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761, 18761-62 (May 2, 2025). By prohibiting sheriffs from honoring detainers, notifying ICE of custody, or transferring custody to federal authorities, the Act would render Plaintiffs' jurisdictions non-cooperative, exposing them to the loss of these critical federal funds.

63. Several Plaintiffs, including Sheriff Jenkins of Frederick County and Sheriff Albert of Washington County, rely on federal SCAAP funds as partial reimbursement for costs incurred for

housing removable aliens. Compliance with the Act will jeopardize their eligibility for these funds and force Plaintiffs to divert scarce local resources to cover the shortfall, undermining their ability to maintain public safety operations. *See* Ashleigh Fields, The Hill, "Trump ending federal funding to sanctuary cities, states" (Jan. 14, 2026) ("President Trump announced … that his administration will strip federal funding from sanctuary cities and states, in line with policies he promoted on the campaign trail"), *available at* https://thehill.com/homenews/administration/5688157-donald-trump-sanctuary-city-funding/.

**The State Civil Enforcement Threat**

64. If Plaintiffs decline to follow the Act and continue cooperating with federal immigration authorities, they face an equally real and immediate threat of civil enforcement from the State Attorney General, private individuals, and activist organizations. The Act itself expressly authorizes the Attorney General to bring civil actions, and aggrieved individuals (or activist organizations acting on their behalf) are likewise empowered to sue for injunctive relief.

65. Advocacy groups and supporters of SB 791 have made clear that the enforcement provisions of the Act will be used aggressively. Key examples include:

   a. The ACLU of Maryland, a leading supporter of the Act, has celebrated its passage. The press describes the Act as addressing "a critical gap in Maryland's protections for immigrant communities" by setting "limits on how law enforcement can informally collude with ICE," protecting people "who are innocent or have yet to be convicted of a crime from notification and transfer to ICE without a court order or a judicial warrant," and banning "the unconstitutional practice of holding people who are released from local correctional facilities past their release date for the purposes of immigration enforcement without a judicial warrant." The press release stresses that

the ACLU "will continue fighting to fully disentangle Maryland's legal system from immigration enforcement and ensure our communities are protected by the law rather than targeted by it." ACLU of Md., Press Release, "Ten Years in the Making: Maryland Passes the Community Trust Act" (Apr. 13, 2026), https://www.aclu-md.org/press-releases/ten-years-in-the-making-maryland-passes-the-community-trust-act/.

b.  We Are CASA, a major immigrant-rights organization and leading supporters of SB 791, has made clear that the enforcement provisions of the Act will be used aggressively. In its press release celebrating the bill's passage, We Are CASA stated that the Act "limits state and local law enforcement from colluding with federal immigration enforcement (ICE), allowing local law enforcement to focus on genuine public safety and rebuilding trust with immigrant communities." The organization further described the Act as establishing "a clear, statewide standard by ending voluntary local collaboration with ICE" and requiring "a judicial warrant" before any detention or transfer to ICE. We Are CASA, Press Release, "Following Historic Session, We Are CASA Celebrates Passage of Community Trust Act and Data Privacy Act" (Apr. 14, 2026), https://wearecasa.org/following-historic-session-we-are-casa-celebrates-passage-of-community-trust-act-and-data-privacy-act/. In earlier testimony submitted in support of the bill, We Are CASA emphasized the new enforcement tools. *See* Testimony of Alice Barrett, We Are CASA, on S.B. 791 (Mar. 31, 2026) (noting the Act's creation of "statewide protections against federal overreach").

c.  Labor groups, including 32BJ SEIU, have expressed strong support for SB 791. In written testimony submitted to the Senate Judicial Proceedings Committee, Jaime Contreras (Executive Vice President of 32BJ SEIU) noted that 32BJ SEIU represents

over 4,000 members in Maryland, "predominantly immigrants and people of color," and emphasized that the union fights to build communities "where immigrants can live free of fear and are treated with fundamental dignity and respect." Testimony of Jaime Contreras, 32BJ SEIU, on S.B. 791 (Feb. 25, 2026), *available at* https://mgaleg.maryland.gov/cmte_testimony/2026/jpr/34838_03312026_94647-720.pdf.

    d.   Sponsor Senator Clarence Lam has repeatedly highlighted that the Act closes loopholes and creates enforceable mechanisms to hold sheriffs and correctional facilities accountable for any continued cooperation with ICE. In his public statement announcing the passage of the bill, Senator Lam stated that the Act was necessary "to prevent counties and sheriffs from using backdoor loopholes and workarounds to collaborate with ICE's deportation machine." *See* Instagram Post by Clarence Lam (Apr. 12, 2026), *available at* https://www.instagram.com/p/DXBMCSUjn47/?img_index=1.

66. These public statements make clear that the consequences for not complying with the Act are concrete and impending. Activist organizations and individuals have already signaled their intent to use the Act's private right of action against any sheriff or facility that defies the Act's prohibitions. Plaintiffs therefore face civil suits and injunctions the moment they share information with ICE, honor a federal detainer, notify ICE of a custody status, or transfer an individual to federal authorities without the narrow judicial warrant the Act demands.

**The Bottom Line: An Unconstitutional Dilemma**

67. Facing the Act's command to violate federal law and their oaths of office on one hand, and the imminent threat of civil enforcement by the Maryland Attorney General or private parties on

25

the other hand, Plaintiffs are trapped in a genuine and immediate dilemma. This dilemma becomes even more dire in light of the fact that compliance with the Act would jeopardize critical federal funding, including SCAAP reimbursements on which several Plaintiffs rely. This dilemma constitutes a particularized injury that is fairly traceable to the Act and redressable by the relief sought. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

68. The harm from this dilemma is immediate, concrete, and irreparable. Upon the Act's effective date, Plaintiffs will be required to violate their oaths of office, change long-standing operational practices, adopt restrictive policies, and release individuals subject to valid federal detainers. This will not only increase the risk that dangerous criminal aliens remain in Maryland communities, directly undermining Plaintiffs' core public-safety mission, but will expose Plaintiffs to federal criminal liability. Compliance with the Act would also jeopardize critical federal funding, including SCAAP reimbursements on which several Plaintiffs rely.

## CLAIMS FOR RELIEF

### <u>Count I</u>
### Violation of the Supremacy Clause (Conflict-Impossibility Preemption)

69. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully stated herein.

70. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

71. One of the key elements of federal immigration law that Congress has enacted are the anti-harboring provisions codified at 8 U.S.C. § 1324, which reads in pertinent part:

Bringing in and Harboring Certain Aliens

(a) Criminal penalties.—

26

(1)(A) Any person who—

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; …

(v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

(ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both … .

72. The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). Thus, § 1324 applies to individual law enforcement agents (including Plaintiffs) and correctional facilities.

73. By preventing local law enforcement from providing the information or cooperation that federal agents, including ICE, requests in the course of enforcing federal immigration laws, the Act compels local law enforcement agents and correctional facilities to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). For example, when ICE requests the release date of an alien from a local jail and local authorities refuse to provide that information (as mandated by the Act), those authorities are shielding the alien from detection and concealing him from arrest. Likewise, when ICE agents arrive to assume custody and local officials refuse to transfer the alien (or deliberately allow the alien to leave without transfer), they are harboring the alien in a building or place and obstructing a federal proceeding or justice.

74. Federal courts have interpreted the harboring provision broadly to encompass conduct that substantially facilitates an alien's ability to remain in the United States undetected. For example, the Fourth Circuit has upheld convictions for harboring where defendants provided housing and shelter to undocumented immigrants, recognizing that such assistance can constitute shielding from detection. *See United States v. Villalobos Aguilar*, 477 F. App'x 1000 (4th Cir. 2012). Other courts have similarly adopted a "substantial facilitation" test, holding that actions making it easier for an alien to remain in the United States can constitute harboring. *See United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975); *United States v. DelRio-Mocci*, 672 F.3d 241, 246–48 (3d Cir. 2012); *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1072 (5th Cir. 1982); *United States v. Zheng*, 306 F. App'x 984, 989–90 (6th Cir. 2009); *United States v. Rushing*, 313 F.3d 428, 434 (8th Cir. 2002).

75. In addition, compliance with the Act exposes Plaintiffs to liability under 18 U.S.C. § 111(a)(1), which criminalizes anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a federal officer (including ICE agents) while the officer is engaged in the performance of official duties. Courts have consistently held that this statute reaches a broad range of conduct that interferes with federal officers. *See United States v. Feola*, 420 U.S. 671 (1975); *United States v. Briley*, 770 F.3d 267, 274 (4th Cir. 2014); *United States v. Gagnon*, 553 F.3d 1021 (6th Cir. 2009); *United States v. Stands Alone*, 11 F.4th 532 (7th Cir. 2021); *United States v. Melhuish*, 6 F.4th 380 (2d Cir. 2021). The threat of liability under § 111 for complying with the Act is concrete and measurable—especially since federal prosecutors have dramatically increased § 111 filings in the past year, consistent with the enforcement priorities of the Trump administration.

76. Finally, complying with the Act also exposes Plaintiffs to liability under other federal criminal provisions such as 18 U.S.C. § 371 (conspiracy to defraud the United States or obstruct lawful government functions), 18 U.S.C. § 1505 (obstruction of proceedings before departments or agencies), 18 U.S.C. § 1001 (false statements or concealment of material facts), and 18 U.S.C. § 1071 (concealing a person from arrest). Courts have interpreted these statutes broadly in ways that could reach systematic non-cooperation with federal immigration enforcement. *See, e.g.*, *United States v. Arch Trading Co.*, 987 F.2d 1087, 1091 (4th Cir. 1993); *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 406 (4th Cir. 1985); *United States v. Silva*, 745 F.2d 840, 848 (4th Cir. 1984).

77. These precedents demonstrate that Plaintiffs' compelled compliance with the Act would expose them to federal criminal liability under § 1324, § 111, and the other federal offenses discussed above. The Act is thus preempted as making compliance with both federal and state law an impossibility.

## Count II
### Violation of the Supremacy Clause (Conflict-Obstacle Preemption)

78. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully stated herein.

79. The Supremacy Clause prohibits not only direct conflicts with federal law, but also state laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation omitted). A state law is preempted under obstacle preemption when it "interferes with the careful balance struck by Congress" or frustrates the federal government's ability to enforce its chosen immigration policy. *Id.* at 406.

80. The Act stands as a direct and substantial obstacle to the full purposes and objectives of federal immigration law. Congress has enacted a comprehensive statutory scheme that relies

heavily on state and local cooperation to identify, detain, and remove removable aliens—particularly those who have committed serious crimes. *See* 8 U.S.C. §§ 1226, 1226(c), 1231, 1357(g), 1373. Federal regulations expressly contemplate and invite local assistance through immigration detainers, 8 C.F.R. § 287.7, and Congress has authorized the Secretary of Homeland Security to enter into agreements allowing state and local officers to perform federal immigration functions, 8 U.S.C. § 1357(g). The harboring statute, 8 U.S.C. § 1324(a)(1)(A)(iii), further penalizes efforts to shield removable aliens from detection. These provisions reflect Congress's deliberate choice to enlist the assistance of state and local law enforcement to make federal immigration enforcement effective.

81. Congress reinforced this cooperative framework through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which include 8 U.S.C. §§ 1373 and 1644. These statutes expressly prohibit any State or local government entity from restricting the sharing of immigration-status information with federal authorities.

82. The Act frustrates this federal scheme at every turn. By prohibiting Plaintiffs and their deputies and correctional staff from honoring ICE detainers, notifying federal authorities that a removable alien is in custody, transferring custody to ICE, or sharing information obtained in the course of official duties—unless presented with a narrow "judicial warrant" that expressly excludes administrative warrants issued by DHS or DOJ—the Act prevents the very cooperation that federal law invites and relies upon. These prohibitions apply even to individuals convicted of serious felonies, sex offenses, or other crimes for which federal law mandates detention and removal. The Act thereby creates a statewide policy of non-cooperation that directly obstructs the federal government's ability to enforce the immigration laws Congress enacted.

30

83. The obstacle is not hypothetical. Plaintiffs have long cooperated with federal immigration authorities by honoring detainers, providing notice of custody and impending releases, facilitating transfers, and sharing information. The Act now compels them to cease these practices and, in effect, to violate federal criminal laws prohibiting harboring (§ 1324), impeding federal officers (§ 111), and the other federal offenses discussed above. This is precisely the type of state interference that the Supremacy Clause forbids. *See Arizona*, 567 U.S. at 406–07 (state law that "interferes with the careful balance struck by Congress" is preempted); *see also United States v. South Carolina*, 720 F.3d 518, 529–31 (4th Cir. 2013) (state laws that obstruct federal immigration enforcement are preempted).

84. A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). By design, the Act frustrates the INA in two of its central aims—not only the obvious purpose that immigration law be enforced, but that federal, state, and local cooperation foster effective enforcement.

## Count III
### Violation of the Supremacy Clause (Express Preemption)

85. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully stated herein.

86. The Supremacy Clause prohibits state laws that are expressly preempted by federal statute. The Act is expressly preempted by 8 U.S.C. §§ 1373 and 1644. Section 1373(a) provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [Department of Homeland Security] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 1373(b) similarly prohibits any restriction on the maintenance or exchange of such information with other law enforcement entities.

31

87. Section 1644 contains nearly identical language, providing that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [Department of Homeland Security] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

88. The Act directly violates these express commands. It prohibits Plaintiffs and other local law enforcement officers from (1) notifying federal immigration authorities that an individual is in custody, (2) providing federal immigration authorities with information obtained in the course of their duties unless required by a valid court order (expressly excluding documents issued by DHS or DOJ), and (3) transferring an individual to federal immigration authorities unless presented with a narrow judicial warrant that excludes administrative warrants. *See* Md. Code Ann., Corr. Servs. § 8-805(b)(2); Crim. Proc. § 5-104(b)(2). These prohibitions fall squarely within the heartland of what §§ 1373 and 1644 preempt.

89. The legislative history of §§ 1373 and 1644 confirms Congress's intent to prevent exactly the type of state-level obstruction embodied in the Community Trust Act. Both provisions were enacted in 1996 as part of IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, and PRWORA, Pub. L. No. 104-193, 110 Stat. 2105. The Senate Judiciary Committee Report accompanying IIRIRA emphasized that "the cooperation of state and local officials is essential to the enforcement of the immigration laws," and that any state or local restriction on the sharing of immigration-status information would undermine federal enforcement efforts. S. Rep. No. 104-249, at 19–20 (1996).

90. The Conference Report accompanying PRWORA similarly made clear that Congress sought to "bar any restriction on local police in their communications with [federal immigration authorities], including the whereabouts of illegal aliens." H.R. Conf. Rep. No. 104-725, at 383

32

(1996). In short, Congress deliberately chose to prohibit states from erecting barriers to the voluntary exchange of immigration-related information so that federal authorities could effectively identify, locate, and remove removable aliens.

91. The Fourth Circuit has already recognized that state laws interfering with federal immigration enforcement are preempted. In *United States v. South Carolina*, 720 F.3d 518, 529–31 (4th Cir. 2013), the court struck down provisions of South Carolina's immigration law as preempted under *Arizona v. United States*. Other circuits have reached similar conclusions. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1290–93 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1020–21 (9th Cir. 2013). The Community Trust Act is no different. By prohibiting Plaintiffs from cooperating with federal immigration authorities in the precise manner Congress has provided, the Act falls squarely into the Supremacy Clause's zone of preemption.

### <u>Count IV</u>
### Violation of the Supremacy Clause (Intergovernmental Immunity)

92. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully stated herein.

93. Maryland's Community Trust Act violates basic principles of intergovernmental immunity by unlawfully regulating the federal government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

94. The Act does precisely that by directing state and local law enforcement officials not to arrest or detain an individual pursuant to a civil immigration detainer (except in narrow circumstances), and not to honor administrative warrants issued by DOJ or DHS. *See* Md. Code Ann., Corr. Servs. § 8-805(b)(2); Crim. Proc. § 5-104(b)(2).

95. Federal law, however, establishes a system of civil administrative warrants as the basis for immigration arrest and removal and does not require or contemplate the use of a judicial warrant

for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a). The judicial-warrant requirement thus directly regulates DHS's operations by demanding something more than is required by federal law, thereby making the federal scheme unworkable.

96. The Act singles out the federal government by restricting its access to vital information in furtherance of immigration enforcement. The Act specifies that law enforcement officers are not to communicate with federal immigration authorities regarding information about an individual obtained in the course of the law enforcement agent's duties unless required by a valid court order. *See* Md. Code Ann., Crim. Proc. § 5-104(b)(2)(v). It further prohibits law enforcement officers from detaining or prolonging the detention of individuals for the purpose of investigating their citizenship or immigration status, or notifying federal immigration authorities that an individual is in custody unless required by a valid court order. *Id.* § 5-104(b)(2). These provisions unlawfully regulate federal operations by prohibiting key elements of Congress's chosen enforcement regime, and are therefore invalid under the Supremacy Clause.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a. A declaratory judgment that the Community Trust Act is unconstitutional under the Supremacy Clause of the United States Constitution;

b. Preliminary and permanent injunctive relief enjoining Defendants from enforcing the Act against Plaintiffs or any other Maryland sheriffs or local law enforcement officers;

c. An award of Plaintiffs' costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 or any other applicable authority; and

d. Such other and further relief as this Court deems just and proper.

Dated: May 26, 2026                     Respectfully submitted,

_____

Mateo Forero-Norena (Bar No. 30768)
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
Fax: (202) 387-3447
mforero@fairus.org

*Counsel for Plaintiffs*