# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)**

| | |
|---|---|
| JEFFREY R. GAHLER, in his official capacity as Sheriff of Harford County, Maryland, and in his individual capacity, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES MOORE, Governor of the State Maryland, in his official capacity, *et al.*<br><br>Defendants. | Civil Action No. 1:26-cv-02057 |

## DECLARATION OF SHERIFF JEFFREY R. GAHLER

Pursuant to 28 U.S.C. § 1746, I, Jeffrey R. Gahler, declare as follows:

1.  I am the duly elected Sheriff of Harford County, Maryland, and have served in that capacity since December 1, 2014. I have taken the oath of office prescribed in Article I, Section 9, of the Maryland Constitution, which requires me to uphold both Maryland law and the Constitution of the United States. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently to them.

2.  As Sheriff of Harford County, I am the chief law enforcement officer of a county with approximately 268,000 residents. The Sheriff's Office I oversee is the primary law enforcement agency in Harford County, and it is also the largest sheriff's office in the State of Maryland. We provide full-spectrum law enforcement services, operate the Harford County Detention Center, and furnish court security and transport services. I supervise nearly 700 sworn and civilian personnel. As operator of the Detention Center, I am directly responsible for the custody, care, and control of hundreds of inmates at any given time - including pretrial detainees, individuals serving short sentences, and those awaiting transfer to state or federal custody. My responsibilities include ensuring facility security, managing medical and mental health services, and maintaining order twenty-four hours a day, seven days a week.

3.  For over a decade, the Harford County Sheriff's Office and Detention Center have worked closely with federal immigration authorities to keep our communities safe. During that time, we routinely honored U.S. Immigration and Customs Enforcement ("ICE") detainers, notified federal authorities when removable individuals were in our custody, facilitated transfers of custody, and shared information with ICE that we lawfully obtained in the

1

course of our duties. This cooperation is a core part of how we protect the public from criminal aliens.

4.  The scale and impact of this cooperation have been substantial. In a typical year prior to 2026, our Detention Center processed dozens of ICE detainers and conducted hundreds of immigration-related screenings and interviews. From 2020 through 2025, we recorded a total of 1,239 ICE/287(g) interviews and screenings, 298 lodged detainers, and 941 ICE encounters. During this six-year period, ICE interviews and 287(g) screenings increased from 135 in 2020 to 286 in 2025, demonstrating that more foreign-born individuals were being identified and screened within the facility each year. ICE detainers also increased significantly, rising from 18 in 2020 to 95 in 2025, reflecting a growing number of inmates being flagged by ICE for possible removal proceedings. Additionally, ICE encounters increased from 117 in 2020 to 191 in 2025.

5.  A significant percentage of the individuals subject to these detainers and encounters had serious criminal convictions or pending charges. While many individuals were arrested for lower-level offenses such as traffic violations or DUI-related charges, the data also showed a significant number of serious felony cases. During the past five years, there were approximately 50–60 felony-level cases linked to ICE activity. Of those, 35–40 cases involved violent or high-risk felonies (murder, attempted murder, rape, child sex offenses, armed robbery, first-degree assault). Another 15–20 cases involved major drug trafficking, firearms offenses, or organized criminal activity. Charges associated with ICE-related inmates rose from 16 felonies and 119 misdemeanors in 2020, to 63 felonies and 223 misdemeanors in 2025.

6.  Unfortunately, the passage of Senate Bill 791 (the so-called "Community Trust Act") imposes sweeping new prohibitions on local law enforcement agents and correctional facilities, including mine. Among other things, it:

    a.  Bars our law enforcement agents from providing federal immigration authorities with information about an individual obtained in the course of their duties unless required by a valid court order—which expressly excludes administrative warrants issued by the U.S. Department of Justice ("DOJ") or the U.S. Department of Homeland Security ("DHS");

    b.  Forbids our correctional facilities from detaining or prolonging the detention of an individual—even if they are a convicted felon, a registered sex offender, a criminal facing state incarceration, or a person serving an out-of-state sentence of more than five years—for (1) the purpose of investigating their citizenship or immigration status, (2) based on the suspicion that they have committed a civil immigration violation, or (3) at the request of federal immigration authorities unless presented with a valid judicial warrant; and

    c.  Further prohibits our correctional facilities from (1) inquiring about or investigating an individual's citizenship, immigration status, or place of birth, (2) notifying federal immigration authorities that an individual is in custody unless required by

2

a valid court order or judicial warrant, and (3) transferring an individual to federal immigration authorities unless the person is a convicted individual or unless presented with a valid judicial warrant.

7. Concrete examples of the conduct the Act now requires include the following, each drawn from the daily realities our deputies and correctional officers face:

   a. Pre-Release Notification Process: A correctional officer prepares for the release of an inmate serving a sentence. The inmate has an active ICE detainer. Previously, the facility would notify ICE of the impending release so that federal agents could take custody at the jail. Under the Act, the facility cannot notify federal immigration authorities of the individual's custody or impending release. To comply, staff must withhold the release date and location information from ICE, release the inmate into the community without coordination, and instruct officers not to answer any follow-up inquiries from ICE, thereby obstructing a planned transfer of custody.

   b. Preventing ICE Access to a Correctional Facility: If an ICE agent arrives at a correctional facility and asks to enter, saying that he has an administrative warrant for the arrest of an alien about to be released, correctional officers, to comply with the Act's prohibition on transferring custody, must refuse to allow the ICE agent to enter the facility.

8. These are not abstract hypotheticals; they are situations that will likely arise in real-world cases, particularly if, in response to the Act, ICE stakes out or visits correctional facilities to apprehend aliens.

9. If the Act is complied with in the above kinds of situations, the consequences to our community could be devastating, as shown by some particularly alarming examples of individuals currently in our custody:

   a. Subject A: The subject engaged in a verbal altercation that escalated into a physical assault involving a six-inch fixed-blade knife. The victim sustained serious injuries requiring medical treatment. The subject was arrested and charged with offenses falling under categories covered by the Laken Riley Act (including attempted murder, assault, and carrying a dangerous weapon with intent to injure). Prior to the incident, the subject had entered the United States as a refugee and later became a lawful permanent resident. He was subsequently placed into immigration removal proceedings after being convicted of multiple crimes involving moral turpitude. An Immigration Judge ordered the subject removed from the United States. Without communication or coordination with ICE, our Detention Center will have no alternative but to ensure the release of the subject back into the community after incarceration.

   b. Subject B: The subject physically assaulted a woman over an approximately six-hour period by striking, slapping, pushing, shoving, and strangling the victim with his hands. He also restricted the victim's airway by forcing his fingers down her

3

throat, creating a substantial risk of death or serious physical injury. The subject was arrested and charged with first-degree assault and second-degree assault involving a female minor victim. The subject is an alien who reportedly entered the United States within the past five years. Due to the nature of the offenses and the provisions of the Laken Riley Act, the subject is considered removable from the United States. Without communication or coordination with ICE, our Detention Center will have no alternative but to ensure the release of the subject back into the community after incarceration.

   c. Subject C: The subject and a co-defendant repeatedly physically and sexually assaulted the victim (a female minor whom the subject met online) while threatening her with a loaded handgun. The victim sustained injuries requiring medical treatment. The subject was arrested and charged with first-degree rape, assault, and using a firearm during the commission of a felony. The subject is an alien who reportedly entered the United States within the past five years. Due to the violent nature of the offenses and the provisions of the Laken Riley Act, the subject is considered removable from the United States. Without communication or coordination with ICE, our Detention Center will have no alternative but to ensure the release of the subject back into the community after incarceration.

10. As these examples make clear, the Act forces me, my deputies, and my correctional staff into an immediate, irreconcilable dilemma. If we comply with the Act, we must engage in intentional, affirmative acts that obstruct federal immigration enforcement—acts that federal law criminalizes as harboring, impeding federal officers, concealing persons from arrest, obstruction of justice and of federal proceedings, and conspiracy to obstruct lawful government functions.

11. In addition, compliance with the Act will jeopardize critical federal funding my county has received through the State Criminal Alien Assistance Program (SCAAP) that DOJ administers. SCAAP reimburses state and local governments for a portion of the costs of incarcerating removable aliens who have been convicted of serious crimes. Between FY2018 and FY2023, Harford County has received over $500,000 in federal SCAAP reimbursement funds. By forcing us to release these individuals back into the community instead of honoring ICE detainers and facilitating transfers, the Act will dramatically reduce or eliminate our eligibility for future SCAAP reimbursements. This is not a hypothetical loss: we are currently in the process of applying for SCAAP funds for the upcoming fiscal year. If we become ineligible to receive this funding due to our compelled non-cooperation with federal immigration authorities, this will impose a significant and unrecoverable financial burden on county taxpayers.

12. In light of these consequences, I could instead continue our longstanding, congressionally encouraged cooperation with federal immigration authorities as my oath and public-safety duties demand. Under the Act's enforcement provisions, however, doing so would attract immediate civil lawsuits, injunctions, and potential contempt proceedings against me from the Maryland Attorney General or private alien plaintiffs.

4

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of July, 2026, in Harford County, Maryland.

Jeffrey R. Gahler
Sheriff of Harford County, Maryland

5