# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)**

|  |  |
|---|---|
| JEFFREY R. GAHLER, in his official capacity as Sheriff of Harford County, Maryland, and in his individual capacity, *et al.*,<br><br><br>Plaintiffs,<br><br>v.<br><br>WES MOORE, Governor of the State Maryland, in his official capacity, *et al.*<br><br>Defendants. | <br><br><br><br><br>Civil Action No. 1:26-cv-02057 |

## DECLARATION OF SHERIFF CHARLES A. (CHUCK) JENKINS

Pursuant to 28 U.S.C. § 1746, I, Charles A. (Chuck) Jenkins, declare as follows:

1. I am the duly elected Sheriff of Frederick County, Maryland, and have served in that capacity since 2006. I have taken the oath of office prescribed in Article I, Section 9, of the Maryland Constitution, which requires me to uphold both Maryland law and the Constitution of the United States. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently to them.

2. As Sheriff of Frederick County, I am the chief law enforcement officer of a county with approximately 300,000 residents. The Sheriff's Office I oversee is the primary law enforcement agency in Frederick County. We provide full-spectrum law enforcement services, operate the Frederick County Detention Center, and furnish court security and transport services. I supervise nearly 413 sworn and civilian personnel. As operator of the County's correctional facility, I am directly responsible for the custody, care, and control of hundreds of inmates at any given time—including pretrial detainees, individuals serving short sentences, and those awaiting transfer to state or federal custody. My responsibilities include ensuring facility security, managing medical and mental health services, and maintaining order twenty-four hours a day, seven days a week.

3. For nearly two decades, the Frederick County Sheriff's Office and correctional facility have worked closely with federal immigration authorities to keep our communities safe. During that time, we routinely honored U.S. Immigration and Customs Enforcement ("ICE") detainers, notified federal authorities when removable individuals were in our custody, facilitated transfers of custody, and shared information with ICE that we lawfully

1

obtained in the course of our duties. This cooperation is a core part of how we protect the public from criminal aliens.

4. The scale and impact of this cooperation have been substantial. In the eighteen years prior to 2026, our Detention Center lodged an average of 120 ICE detainers a year and conducted an average of 360 immigration-related screenings and interviews. From 2020 through 2025, we recorded a total of 1,694 ICE/287(g) interviews and lodged 436 ICE detainers.

During this six-year period, ICE interviews and 287(g) screenings increased from 109 in 2020, to 406 in 2025, demonstrating that more foreign-born individuals were being identified and screened within the facility each year. ICE detainers also increased significantly, rising from 29 in 2020, to 152 in 2025, reflecting a growing number of inmates being flagged by ICE/287(g) for possible removal proceedings.

5. Unfortunately, the passage of Senate Bill 791 (the so-called "Community Trust Act") imposes sweeping new prohibitions on local law enforcement agents and correctional facilities, including mine. Among other things, it:

   a. Bars our law enforcement agents from providing federal immigration authorities with information about an individual obtained in the course of their duties unless required by a valid court order—which expressly excludes administrative warrants issued by the U.S. Department of Justice ("DOJ") or the U.S. Department of Homeland Security ("DHS");

   b. Forbids our correctional facilities from detaining or prolonging the detention of an individual—even if they are a convicted felon, a registered sex offender, a criminal facing state incarceration, or a person serving an out-of-state sentence of more than five years—for (1) the purpose of investigating their citizenship or immigration status, (2) based on the suspicion that they have committed a civil immigration violation, or (3) at the request of federal immigration authorities unless presented with a valid judicial warrant; and

   c. Further prohibits our correctional facilities from (1) inquiring about or investigating an individual's citizenship, immigration status, or place of birth, (2) notifying federal immigration authorities that an individual is in custody unless required by a valid court order or judicial warrant, and (3) transferring an individual to federal immigration authorities unless presented with a valid judicial warrant.

6. A concrete example of the conduct the Act now requires include the following, each drawn from the daily realities our deputies and correctional officers face:

   a. Discharge of Inmates: ICE is positioned outside the correctional facility waiting for the release of alien inmates. Correctional officers are preparing to release an inmate who has an active ICE detainer after completion of his sentence or bond. Prior to the enactment of the Act, officers would notify ICE of the exact release time and facilitate a controlled handoff in the secure area. Under the Act, which prohibits

transferring custody or providing release information without a judicial warrant, my deputies and correctional staff would have to alter the timing or place of release. To avoid transferring custody of the alien to ICE, staff would have to escort the inmate out an alternative exit in an effort to ensure the release occurs outside the presence of ICE agents and in a manner that maximizes the opportunity for the individual to depart undetected by ICE.

7. This is not an abstract hypothetical; it is a situation that will likely arise in real-world cases, particularly if, in response to the Act, ICE increases its monitoring or stakes out or visits correctional facilities to apprehend aliens.

8. As this example makes clear, the Act forces me, my deputies, and my correctional staff into an immediate, irreconcilable dilemma. If we comply with the Act, we must engage in intentional, affirmative acts that obstruct federal immigration enforcement—acts that federal law criminalizes as harboring, impeding federal officers, concealing persons from arrest, obstruction of justice and of federal proceedings, and conspiracy to obstruct lawful government functions.

9. In addition, compliance with the Act will jeopardize critical federal funding my county has received through the State Criminal Alien Assistance Program (SCAAP) that DOJ administers. SCAAP reimburses state and local governments for a portion of the costs of incarcerating removable aliens who have been convicted of serious crimes. Between FY2018 and FY2023, Frederick County has received over $352,000 in federal SCAAP reimbursement funds. By forcing us to release these individuals back into the community instead of honoring ICE detainers and facilitating transfers, the Act will dramatically reduce or eliminate our eligibility for future SCAAP reimbursements. This is not a hypothetical loss: we are currently in the process of applying for SCAAP funds for the upcoming fiscal year. If we become ineligible to receive this funding due to our compelled non-cooperation with federal immigration authorities, this will impose a significant and unrecoverable financial burden on county taxpayers.

10. In light of these consequences, I could instead continue our longstanding, congressionally encouraged cooperation with federal immigration authorities as my oath and public-safety duties demand. Under the Act's enforcement provisions, however, doing so would attract immediate civil lawsuits, injunctions, and potential contempt proceedings against me from the Maryland Attorney General or private alien plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of _June_, 2026, in Frederick County, Maryland.

Charles A. (Chuck) Jenkins
Sheriff of Frederick County, Maryland

3