# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (BALTIMORE DIVISION)

| | |
|---|---|
| JEFFREY R. GAHLER, in his official capacity as Sheriff of Harford County, Maryland, and in his individual capacity, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES MOORE, Governor of the State Maryland, in his official capacity, *et al.*<br><br>Defendants. | Civil Action No. 1:26-cv-02057 |

## DECLARATION OF SHERIFF BRIAN K. ALBERT

Pursuant to 28 U.S.C. § 1746, I, Brian K. Albert, declare as follows:

1. I am the duly elected Sheriff of Washington County, Maryland, and have served in that capacity since 2022. I have taken the oath of office prescribed in Article I, Section 9, of the Maryland Constitution, which requires me to uphold both Maryland law and the Constitution of the United States. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently to them.

2. As Sheriff of Washington County, I am the chief law enforcement officer of a county with approximately 157,000 residents. The Sheriff's Office I oversee is the primary law enforcement agency in Washington County. We provide full-spectrum law enforcement services, operate the Washington County Detention Center, and furnish court security and transport services. I supervise nearly 300 sworn and civilian personnel. As operator of the County's correctional facility, I am directly responsible for the custody, care, and control of hundreds of inmates at any given time—including pretrial detainees, individuals serving short sentences, and those awaiting transfer to state or federal custody. My responsibilities include ensuring facility security, managing medical and mental health services, and maintaining order twenty-four hours a day, seven days a week.

3. For the last year, the Washington County Sheriff's Office and correctional facility have worked closely with federal immigration authorities to keep our communities safe. During that time, we routinely honored U.S. Immigration and Customs Enforcement ("ICE") detainers, notified federal authorities when removable individuals were in our custody, facilitated transfers of custody, and shared information with ICE that we lawfully obtained

1

in the course of our duties. This cooperation is a core part of how we protect the public from criminal aliens.

4. The scale and impact of this cooperation have been substantial. We previously partnered with ICE by entering into a Memorandum of Understanding (MOU) that allowed us to participate in the 287(g) Warrant Service Officer program. During that time, we served 16 ICE detainers on arrestees that entered our Detention Center. However, our MOU ended on May 14, 2026 after legislation passed in the Maryland General Assembly prohibited this cooperative arrangement.

5. Unfortunately, the passage of Senate Bill 791 (the so-called "Community Trust Act") imposes sweeping new prohibitions on local law enforcement agents and correctional facilities, including mine. Among other things, it:

   a. Bars our law enforcement agents from providing federal immigration authorities with information about an individual obtained in the course of their duties unless required by a valid court order—which expressly excludes administrative warrants issued by the U.S. Department of Justice ("DOJ") or the U.S. Department of Homeland Security ("DHS");

   b. Forbids our correctional facilities from detaining or prolonging the detention of an individual—even if they are a convicted felon, a registered sex offender, a criminal facing state incarceration, or a person serving an out-of-state sentence of more than five years—for (1) the purpose of investigating their citizenship or immigration status, (2) based on the suspicion that they have committed a civil immigration violation, or (3) at the request of federal immigration authorities unless presented with a valid judicial warrant; and

   c. Further prohibits our correctional facilities from (1) inquiring about or investigating an individual's citizenship, immigration status, or place of birth, (2) notifying federal immigration authorities that an individual is in custody unless required by a valid court order or judicial warrant, and (3) transferring an individual to federal immigration authorities unless presented with a valid judicial warrant.

6. Concrete examples of the conduct the Act now requires include the following, each drawn from the daily realities our deputies and correctional officers face:

   a. <u>Routine Booking and Intake Screening:</u> During intake at the Washington County Detention Center, a deputy processes a new arrestee for a local misdemeanor. Routine questioning and database checks reveal the individual is unlawfully present and subject to an active ICE detainer. Previously, staff would flag the status, notify ICE, log the detainer, and hold the individual for transfer. Under the Act, my correctional staff must actively suppress and delete any immigration-related database flags or notes from internal records, instruct intake personnel not to document or preserve the discovered status, process the inmate solely on the local charge without any cross-reference or hold, expedite the booking paperwork to

2

facilitate immediate housing or bond, and schedule the inmate for release into the community on the local timeline without any notification to ICE.

b. Medical or Classification Review: An inmate in the Detention Center requires medical attention or reclassification review. During the review, staff learn (through routine records or conversation) that the inmate is the subject of a DHS administrative warrant or ICE detainer. Previously, the sheriff's office would coordinate with ICE for a safe transfer or hold the inmate until ICE could respond. Under the Act, the facility cannot detain or prolong detention at the request of federal immigration authorities or based on immigration status. To comply, my correctional staff deliberately ignore the warrant by omitting it from all medical and classification documentation, expedite the inmate's treatment or reclassification to advance release eligibility, reassign the inmate to general population or a release-preparation pathway without any federal notation, and physically move or process the inmate in a manner that minimizes any window for ICE access.

c. Release of Inmates: Correctional officers are preparing to release an alien outside the jail, but notices that ICE agents are outside monitoring the jail. Instead of releasing the alien outside as planned (within eyesight of the ICE agents and thus transferring custody to ICE), the correctional officers would have to delay releasing the alien as planned or else release him from the jail through another exit out of sight of the ICE agents, in order to comply with the Act and avoid violating the prohibition on transferring custody to immigration agents. If ICE agents enter the jail and present an administrative warrant for the arrest of an alien about to be released, correctional officers, to comply with the Act, would have to conceal the alien's whereabouts in the jail from the ICE agent, refuse access to the inmates cell, and, if the inmate is already in the presence of the ICE agent when the agent requested custody, escort the alien away from the ICE agent and then either wait for the agent to leave or release the alien through another exit out of sight of the ICE agent.

7. These are not abstract hypotheticals; they are situations that will likely arise in real-world cases, particularly if, in response to the Act, ICE increases its monitoring of court dockets in order to arrive at courthouses to apprehend aliens, or stakes out or visits correctional facilities to apprehend aliens.

8. As these examples make clear, the Act forces me, my deputies, and my correctional staff into an immediate, irreconcilable dilemma. If we comply with the Act, we must engage in intentional, affirmative acts that obstruct federal immigration enforcement—acts that federal law criminalizes as harboring, impeding federal officers, concealing persons from arrest, obstruction of justice and of federal proceedings, and conspiracy to obstruct lawful government functions.

9. In addition, compliance with the Act will jeopardize critical federal funding my county has received through the State Criminal Alien Assistance Program (SCAAP) that DOJ

3

administers. SCAAP reimburses state and local governments for a portion of the costs of incarcerating removable aliens who have been convicted of serious crimes. Between FY2018 and FY2024, Washington County has received over $350,000 in federal SCAAP reimbursement funds. By forcing us to release these individuals back into the community instead of honoring ICE detainers and facilitating transfers, the Act will dramatically reduce or eliminate our eligibility for future SCAAP reimbursements. This is not a hypothetical loss: we are currently in the process of applying for SCAAP funds for the upcoming fiscal year. If we become ineligible to receive this funding due to our compelled non-cooperation with federal immigration authorities, this will impose a significant and unrecoverable financial burden on county taxpayers.

10. In light of these consequences, I could instead continue our longstanding, congressionally encouraged cooperation with federal immigration authorities as my oath and public-safety duties demand. Under the Act's enforcement provisions, however, doing so would attract immediate civil lawsuits, injunctions, and potential contempt proceedings against me from the Maryland Attorney General or private alien plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of June, 2026, in Washington County, Maryland.

Brian K. Albert
Sheriff of Washington County, Maryland

4