**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)**

| | |
|---|---|
| JEFFREY R. GAHLER, in his official capacity as Sheriff of Harford County, Maryland, and in his individual capacity, *et al.*,<br><br><br>Plaintiffs,<br><br>v.<br><br>WES MOORE, Governor, in his official capacity, *et al.*,<br><br>Defendants. | Civil Action No. 1:26-cv-02057 |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION</u>**

Christopher J. Hajec\*
Matt A. Crapo\*
Mateo Forero-Norena (Bar No. 30768)
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
chajec@fairus.org
mcrapo@fairus.org
mforero@fairus.org

\* admitted *pro hac vice*

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS....................................................................................................2

I.      The Sheriffs and their Duties and Functions ..............................................................2

II.     The Community Trust Act...........................................................................................4

ARGUMENT ........................................................................................................................6

I.      Plaintiffs Have Article III Standing to Seek Preliminary Injunctive Relief ..............6

        a.  Plaintiffs Suffer Concrete and Imminent Injuries-in-Fact ...................................7

        b.  Plaintiffs' injuries are fairly traceable to Defendants' conduct and will be
            redressed by injunctive relief. .............................................................................19

II.     Plaintiffs Are Likely to Succeed on the Merits Because the Act Is Preempted........19

        a.  The Community Trust Act Is Conflict-Impossibility Preempted .......................20

        b.  The Community Trust Act Is Conflict-Obstacle Preempted ..............................21

        c.  The Community Trust Act Is Expressly Preempted ...........................................25

        d.  The Community Trust Act Unlawfully Regulates the Federal Government ......26

III.    Plaintiffs Will Suffer Irreparable Harm if the Act Is Implemented.........................27

IV.     The Balance of the Equities and the Public Interest Favor Granting Plaintiffs
        Preliminary Relief.....................................................................................................28

CONCLUSION ...................................................................................................................30

Plaintiffs Jeffrey Gahler, Scott Adams, Brian Albert, Donald Baker, Richard Cox, Matthew Crisafulli, James DeWees, Joseph Gamble, Steven Hall, Dennis Hickman, Gery Hofmann, Ronald Howard, Charles Jenkins, Michael Lewis, Bryson Meyers, James Phillips, and Craig Robertson ("Plaintiffs"), by counsel, respectfully submit this Memorandum in Support of their Motion for a Preliminary Injunction. ECF Doc. 7.

## INTRODUCTION

The recently enacted Community Trust Act ("the Act") (codified at Md. Code Ann., Corr. Servs. § 8-805 and Crim. Proc. § 5-104) is designed to shield criminal aliens from federal immigration law enforcement. The Act prohibits Plaintiffs, their deputies, and their correctional officers from honoring federal immigration detainers, notifying federal authorities that an alien is in custody, transferring custody of such aliens to U.S. Immigration and Customs Enforcement ("ICE") agents, or providing ICE with information relating to such aliens obtained in the course of official duties—unless a narrow "judicial warrant" is presented, a term expressly excluding administrative warrants issued by the Department of Homeland Security ("DHS") or the Department of Justice ("DOJ"). These prohibitions apply even to many convicted criminals whom federal law requires to be detained and removed.

The Act forces Plaintiffs—elected Maryland Sheriffs—into a dilemma: (1) comply with the Act and risk both federal criminal liability (for example, under 8 U.S.C. § 1324) and loss of federal funding; or (2) defy the Act and face civil enforcement by the Maryland Attorney General or private plaintiffs. This dilemma confers Article III standing, creates imminent irreparable harm, and renders the Act conflict-preempted under the Supremacy Clause. Plaintiffs are thus likely to succeed on the merits. The balance of equities and the public interest, moreover, strongly favor

1

enjoining this unconstitutional law that undermines public safety. Preliminary injunctive relief should therefore be granted.

## STATEMENT OF FACTS

### I.  The Sheriffs and their Duties and Functions

Plaintiffs are Maryland Sheriffs who were elected to serve as the chief law enforcement officers of their respective counties. Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 2-104, each Plaintiff has taken the oath prescribed in Article I, section 9, of the Maryland Constitution, which reads, in relevant part:

> I, _____, do swear, (or affirm, as the case may be,) that I will support the Constitution of the United States; and that I will be faithful and bear true allegiance to the State of Maryland, and support the Constitution and Laws thereof; and that I will, to the best of my skill and judgment, diligently and faithfully, without partiality or prejudice, execute the office of_____, according to the Constitution and Laws of this State.

Plaintiffs bear ultimate responsibility for public safety and the enforcement of state and local laws. Plaintiffs supervise sworn deputy sheriffs who perform full law enforcement duties, including conducting routine patrol operations, responding to calls for service, investigating crimes, enforcing traffic laws, making arrests, and otherwise protecting the public from criminal activity. *See, e.g.*, Declaration of Sheriff Lewis ¶ 2 (attached hereto as <u>Exhibit 1</u>). In addition to these core functions, Plaintiffs are responsible for providing courthouse security and protection of judges, juries, and witnesses during court proceedings. *See* Declaration of Sheriff Gahler ("Gahler Dec.") ¶ 2 (attached hereto as <u>Exhibit 2</u>).

In many jurisdictions, including those of Plaintiffs Gahler (Harford County), Jenkins (Frederick County), Albert (Washington County), DeWees (Carroll County), Meyers (Garrett County), Robertson (Allegany County), Hall (Caroline County), Adams (Cecil County), and Cox (Calvert County), the Sheriff operates and manages the local correctional facility. In those

2

jurisdictions, Plaintiffs are responsible for the day-to-day operation of the county detention center, including the custody, care, and control of all inmates. *See* Declaration of Sheriff Jenkins ("Jenkins Dec.") ¶ 2 (attached hereto as Exhibit 3). They supervise hundreds of sworn deputies and correctional officers who staff the facilities. These facilities typically house hundreds of inmates at any given time, including pretrial detainees, individuals serving short sentences, and those awaiting transfer to state or federal custody. *See* Declaration of Sheriff Albert ("Albert Dec.") ¶ 2 (attached hereto as Exhibit 4).

Plaintiffs and their officers have long cooperated with federal immigration authorities by honoring ICE detainers, providing notice to ICE of the custody and impending releases of alien inmates, transferring their custody to ICE, and sharing with ICE information obtained in the course of their official duties. Ex. 3, Jenkins Dec. ¶ 3-4. Historically, Plaintiffs have received and honored dozens of ICE detainers and participated in joint task forces with federal agencies. *Id.* This cooperation was a routine and critical part of Plaintiffs' public-safety mission, allowing them to remove criminal aliens from their communities and prevent the release of individuals who posed threats to public safety. *Id.*

Several of Plaintiffs' jurisdictions have received reimbursement from the U.S. DOJ for the costs of incarcerating removable aliens in their correctional facilities as part of the State Criminal Alien Assistance Program ("SCAAP"). Through SCAAP, state and local governments receive funds to offset the costs of incarcerating certain criminal aliens who are unlawfully present in the United States and have been convicted of one or more felonies or two or more misdemeanors. In recent years, Harford County, Frederick County, and Washington County have received hundreds of thousands of dollars in SCAAP reimbursements for the incarceration of such individuals in their sheriff-operated detention centers. Ex. 2, Gahler Dec. ¶ 11; Ex. 3, Jenkins

Dec. ¶ 9; Ex. 4, Albert Dec. ¶ 9. This funding is critical to the sheriffs' ability to maintain safe and secure correctional facilities while fulfilling their constitutional and statutory duties to house and manage inmates. *Id.*

## II.    The Community Trust Act

On April 13, 2026, the Maryland General Assembly passed Senate Bill 791 (enacting the "Community Trust Act" or "the Act") as emergency legislation. *See* ECF Doc. 1–1. The Act became law on May 22, 2026, without the Governor's signature. *See* ECF Doc. 1–2; Md. Const. art. II, § 17(c) (providing that any Bill, like SB 791, presented to the Governor after adjournment of the General Assembly, "shall become law without the Governor's signature unless it is vetoed by the Governor within 30 days after its presentment"). The Act restricts the ability of law enforcement agents (through Md. Code Ann., Crim. Proc. § 5-104) and correctional facilities (through Md. Code Ann., Corr. Servs. § 8-805) to communicate or cooperate with federal immigration authorities.

First, the Act provides that "law enforcement agents" may not "provide federal immigration authorities with information about an individual obtained in the course of the law enforcement agent's duties unless required by a valid court order." Md. Code Ann., Crim. Proc. § 5-104(b)(2)(v).[1] The Act prohibits law enforcement agents from: (1) inquiring about an individual's citizenship, immigration status, or place of birth during a stop, search, or arrest; (2) detaining or prolonging the detention of an individual to investigate either his citizenship or immigration status, or based on the suspicion that he has committed a civil immigration violation; (3) transferring an individual to federal immigration authorities unless required by federal law; or (4) coercing, intimidating, or threatening any individual based on his actual or perceived

---

[1]  The Act specifies that a "valid court order" does not include a document issued by the DOJ, the DHS, or any successor agency. *Id.* § 5-104(a)(3)

citizenship or immigration status (or that of his family/household members or his legal guardians).
*Id.* § 5-104(b)(2)(i)-(iv).

Second, the Act imposes new restrictions on "local correctional facilities" operated by a county or municipal corporation (including the Baltimore City Detention Center and centralized booking facility). Specifically, those facilities may not:

> "inquire about or investigate an individual's citizenship, immigration status, or place of birth";
>
> "detain or prolong the detention of an individual" (1) for the purpose of "investigating the individual's citizenship or immigration status," (2) "based on the suspicion that the individual has committed a civil immigration violation," or (3) "at the request of federal immigration authorities unless presented with a valid judicial warrant";
>
> "notify federal immigration authorities that an individual is in custody unless required by a valid court order or judicial warrant"[2]; or
>
> "transfer an individual to federal immigration authorities unless presented with a valid judicial warrant"

Md. Code Ann., Corr. Servs. § 8-805(b)(2).

These prohibitions apply broadly to the vast majority of individuals in the custody of local correctional facilities.[3] The Act exempts only certain "convicted individuals" from the majority of these prohibitions (that is, individuals convicted of any felony, registered sex offenders, those sentenced to state incarceration, or those with out-of-state sentences of at least five years served). *Id.* § 8-805(a)(4). The Act, however, still prohibits local correctional facilities from detaining or prolonging the detention of these "convicted individuals" for the purpose of investigating their

---

[2]  In this new code section, the Act again specifies that neither a "court order" nor a "judicial warrant" includes a document issued by DOJ, DHS, or a successor agency. *Id.* § 8-805(a)(3), (6).

[3]  The Act provides, in contrast, that state correctional facilities must provide written notice to federal authorities of the release of any individual subject to an active immigration detainer within 48 hours before release. *See id.* § 8-805(c)(2).

5

citizenship or immigration status, based on the suspicion they have committed a civil immigration violation, or at the request of federal immigration authorities unless presented with a valid judicial warrant. *Id.* § 8-805(b)(1).

Finally, the Act authorizes "the Attorney General or an individual who has been subjected to a violation" of these correctional facility prohibitions to "bring a civil action to enforce" the law. *Id.* § 8-805(e)(1). It further provides that a court adjudicating an action brought under the Act "may issue temporary, preliminary, or permanent injunctive relief to prevent an act that would constitute a violation" of the law. *Id.* § 8-805(e)(2).

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). To obtain a preliminary injunction, the moving parties "'must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). "The first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### I. Plaintiffs have Article III standing to seek preliminary injunctive relief.

To establish Article III standing, a plaintiff must show (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely that a favorable judicial decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In the context of a preliminary injunction motion, the standing inquiry is the same as at the merits stage, but the

6

plaintiff need only make a "clear showing" that it is likely to satisfy the requirements. *Winter*, 555 U.S. at 20; *Pashby*, 709 F.3d at 316.

Plaintiffs easily satisfy each element. The Act forces them into a dilemma that creates concrete, imminent injury directly traceable to the Act and redressable by a preliminary injunction.

### a.  Plaintiffs suffer concrete and imminent injuries-in-fact.

The dilemma Plaintiffs face as a result of the Act's prohibitions is a classic injury-in-fact. Plaintiffs must either (1) comply with the Act and thereby commit harboring and obstruction and also jeopardize receiving critical SCAAP funding, or (2) defy the Act and thereby face civil lawsuits and injunctions from the Maryland Attorney General and private parties. The Act also inflicts a cognizable injury-in-fact by forcing Plaintiffs to violate their oaths of office.

The federal harboring statute makes it a crime for any "person"—a term that includes state and local officials—knowingly or recklessly to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection" an alien who "has come to, entered, or remains in the United States in violation of law" in "any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii).

Federal courts have interpreted the harboring provision broadly to encompass conduct that substantially facilitates an alien's ability to remain in the United States undetected. For example, the Fourth Circuit has upheld convictions for harboring where defendants provided housing and shelter to undocumented immigrants, recognizing that such assistance can constitute shielding from detection. *See United States v. Villalobos Aguilar*, 477 F. App'x 1000 (4th Cir. 2012).

Other circuits have similarly adopted a "substantial facilitation" test, holding that actions making it easier for an alien to remain in the United States can constitute harboring. *See United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975) (holding that "harbor" encompasses conduct

7

that enables an alien to remain in the United States undetected, without requiring physical concealment or intent to evade authorities); *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1072 (5th Cir. 1982) (interpreting "shield from detection" and "harbor" broadly to include actions that prevent federal authorities from locating or apprehending an alien); *United States v. Rushing*, 313 F.3d 428, 434 (8th Cir. 2002) (holding that harboring includes any conduct that substantially facilitates an alien's illegal presence, such as providing shelter or assistance that enables the alien to avoid detection); *United States v. Zheng*, 306 F. App'x 984, 989–90 (6th Cir. 2009) (affirming that providing employment, housing, and other support that makes it substantially easier for undocumented aliens to remain in the United States constitutes harboring); *United States v. DelRio-Mocci*, 672 F.3d 241, 246–48 (3d Cir. 2012) (holding that providing assistance that substantially facilitates an alien's continued illegal presence can constitute harboring).

These precedents demonstrate that Plaintiffs' compliance with the Act would likely expose them to federal criminal liability under 8 U.S.C. § 1324. For example, if a Plaintiff receives a request from ICE for the release date of an alien in his custody, the Plaintiff, if he complies with the Act, will refuse to provide that information. Since this refusal will keep ICE in the dark about when the alien will be released, this refusal will "conceal" the presence of the alien "in a[] building" before the alien's release and "in a[] place" (outside the jail) after his release, in violation of the harboring statute. 8 U.S.C. § 1324(a)(1)(A)(iii).

Also, in response to the Act, ICE is very likely to stake out Plaintiffs' jails in the hope of apprehending removable aliens when they are released. *See*, *e.g.*, ICE press release, *ICE Baltimore arrests Guatemalan alien with deadly weapons charges* (Feb. 4, 2025), available at: https://archive.ph/rKyxm (describing how an ICE agent waited in the lobby of the Prince George's County, Maryland, jail in order to arrest a criminal alien upon his release after local

officers declined to honor an immigration detainer); ICE press release, *ICE arrests convicted rapist after local jurisdiction fails to honor immigration detainer* (May 27, 2025), available at: https://archive.ph/YYTx4 (describing how ICE Baltimore's Fugitive Operations team arrested a criminal alien "at large as he walked out" of the Howard County jail after county officials declined to honor an immigration detainer and released the criminal alien back into the community on two separate occasions); KOAT Target 7 news report (Nov. 19, 2025), available at: https://www.youtube.com/watch?v=0ifSEtt4bOU&t=128s (describing how ICE adapted tactics in New Mexico to monitor public online databases and court dockets for upcoming releases or appearances, attend court hearings, and then wait outside release centers or jails to take custody of aliens as they are released by sanctuary jurisdictions); Stephanie Zappelli, *Can ICE wait in jail lobby to detain inmates under new SLO County policy?*, The Tribune (June 24, 2026), available at: https://archive.ph/M5tVQ (describing how ICE agents gathered in California's San Luis Obispo County Jail lobby, waiting to take inmates into custody when they completed their sentence); Isabel Funk & Beth Slovic, *His family came to pick him up from Oregon prison. ICE was waiting too*, The Oregonian/Oregon Live (Mar. 20, 2026), available at: https://archive.ph/PBMq2 (describing how ICE agents positioned themselves outside an Oregon prison in a sanctuary jurisdiction and arrested a criminal illegal alien immediately as he was released); Ben Bradley, *VIDEO: Here's how ICE agents operate at courthouses, inside jails*, WGN9 (Sep. 9, 2025), available at: https://archive.ph/RFdPE (describing how ICE agents stake out jails and courthouses in Chicago area sanctuary jurisdictions to arrest criminal aliens upon their release from local custody); County of Santa Clara, California, press release, *No advance notice, no notifications: Sheriff's Office clarifies ICE interaction at County jail* (June 24, 2025), available at:   https://sheriff.santaclaracounty.gov/no-advance-notice-no-notifications-sheriffs-

9

office-clarifies-ice-interaction-county-jail (describing how ICE agents confirm names and release dates via publicly accessible information and take released aliens into custody at county facilities and courthouses without sheriff assistance or advance notification); News Staff, *Federal agents detain recently released inmates from Lane County Jail*, KVAL13 (Oct. 23, 2025), available at: https://archive.ph/u2s18 (describing an incident in which ICE agents staked out the lobby in the Lane County Jail in Oregon to arrest a recently released criminal alien).

When ICE begins to stake out Plaintiffs' correctional facilities, Plaintiffs are likely to be forced into more illegal—indeed, criminal—actions if they are to comply with the Act. Sheriff Gahler states that, "[i]f an ICE agent arrives at a correctional facility and asks to enter, saying that he has an administrative warrant for the arrest of an alien about to be released, correctional officers, to comply with the Act's prohibition on transferring custody, must refuse to allow the ICE agent to enter the facility." Ex. 2, Gahler Dec. ¶ 7(b). Thus, the Act would force correctional officers to harbor the alien in a building. Sheriff Jenkins describes how the Act would force evasive tactics when "ICE is positioned outside the correctional facility waiting for the release of alien inmates." Ex. 3, Jenkins Dec. ¶ 6(a), 7. To comply with the prohibitions on notification and transfer, "my deputies and correctional staff would have to alter the timing or place of release" and "escort the inmate out an alternative exit in an effort to ensure the release occurs outside the presence of ICE agents and in a manner that maximizes the opportunity for the individual to depart undetected by ICE." *Id.* Jenkins emphasizes that this "is a situation that will likely arise in real-world cases, particularly if, in response to the Act, ICE increases its monitoring or stakes out or visits correctional facilities to apprehend aliens." *Id.* ¶ 7. Sheriff Albert further explains:

> Correctional officers are preparing to release an alien outside the jail, but notices (sic) that ICE agents are outside monitoring the jail. Instead of releasing the alien outside as planned (within eyesight of the ICE agents and thus transferring custody to ICE), the correctional officers would have to delay releasing the alien as planned

10

> or else release him from the jail through another exit out of sight of the ICE agents, in order to comply with the Act and avoid violating the prohibition on transferring custody to immigration agents. If ICE agents enter the jail and present an administrative warrant for the arrest of an alien about to be released, correctional officers, to comply with the Act, would have to conceal the alien's whereabouts in the jail from the ICE agent, refuse access to the inmates (sic) cell, and, if the inmate is already in the presence of the ICE agent when the agent requested custody, escort the alien away from the ICE agent and then either wait for the agent to leave or release the alien through another exit out of sight of the ICE agent.

Ex. 4, Albert Dec. ¶ 6(c).

Guidance issued by the Maryland Attorney General on the Act justifies Sheriff Jenkins's and Sheriff Albert's interpretation of its requirements. That guidance takes a broad view of the Act, interpreting the provision of any advance release notification or custody-status information to ICE as both a forbidden notification "that an individual is in custody" and "a step towards a de facto 'transfer'" for non-convicted individuals—actions that must be avoided regardless of whether a detainer has been issued. Maryland Attorney General, *Local Enforcement of Federal Immigration Law* (June 22, 2026), *available at* https://oag.maryland.gov/ FederalActionsResponse/Documents/pdfs/Law%20Enforcement%20Immigration%20Guidance %2006.22.2026%20Update%20%28FINAL%29.pdf at 7–8. A "de facto 'transfer'" would seem to refer to a transfer of a kind that takes place when an officer knowingly releases an alien in the proximity of an ICE agent waiting to assume custody.

Sheriff Albert also illustrates the daily operational mandates in his facility. During routine booking of a new arrestee revealed to be unlawfully present with an ICE detainer, staff "must actively suppress and delete any immigration-related database flags or notes from internal records," "process the inmate solely on the local charge without any cross-reference or hold," and schedule release "without any notification to ICE." Ex. 4, Albert Dec. ¶ 6(a), Similarly, during a medical or classification review where a DHS warrant is discovered, staff must "deliberately

ignore the warrant by omitting it from all medical and classification documentation, expedite the inmate's treatment or reclassification to advance release eligibility," and "physically move or process the inmate in a manner that minimizes any window for ICE access." *Id.* ¶6(b).

In short, if the Act is complied with, it will transform Plaintiffs' correctional facilities into hives of harboring. The facilities will keep ICE in the dark about whether aliens are inside or outside the facilities, thus concealing them in a building or a place; they will delete records and process inmates in a manner calculated to minimize access by ICE; they will deny ICE entry into the facilities to prevent removable aliens from being apprehended, thus harboring the aliens in a building; they will alter the timing of releases, or slip removable aliens out of unobserved exits, to avoid the transfer of custody to ICE agents waiting outside; and they will walk aliens out of the presence of ICE agents seeking custody to prevent that custody from taking place. Such actions clearly constitute harboring in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) (prohibiting concealing, harboring, or shielding from detection an unlawfully present alien in any place, building or means of transportation), and also obstruction in violation of 8 U.S.C. §§ 1505 (prohibiting obstruction of agency proceedings), 1512(c)(2) (prohibiting obstruction of any official proceeding), concealing a person from arrest in violation of 18 U.S.C. § 1071 (prohibiting harboring or concealing any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States), false statements or concealment of material facts in violation of 18 U.S.C. § 1001 (prohibiting same), and impeding or interfering with federal officers in violation of 18 U.S.C. § 111 (prohibiting same).

Federal authorities have recently investigated and prosecuted law enforcement and judicial officials for just such harboring-style violations. Concrete examples include:

1)  <u>Sheriff James R. Metts (Lexington County, South Carolina, 2014):</u> A sitting sheriff pleaded guilty to conspiracy to harbor and conceal illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(v)(I) for using his official position and county resources to shield undocumented individuals from federal detection and removal. *See* Press Release, U.S. Attorney's Office, District of South Carolina, "Former Lexington County Sheriff James R. Metts Pleads Guilty to Conspiring to Harbor and Conceal Illegal Aliens" (Dec. 30, 2014), available at: https://www.fbi.gov/contact-us/field-offices/columbia/news/press-releases/former-lexington-county-sheriff-james-r.-metts-pleads-guilty-to-conspiring-to-harbor-and-conceal-illegal-aliens.

2)  <u>Judge Shelley M. Richmond Joseph (Newton District Court, Massachusetts, 2018):</u> A sitting state court judge was indicted for conspiracy to obstruct justice (18 U.S.C. § 1512(k)) and obstruction of justice (18 U.S.C. § 1512(c)(2)) after allegedly helping a twice-deported illegal alien evade ICE agents at her courthouse directing him to leave through a rear courthouse exit, allowing him to evade the waiting federal agents. Federal prosecutors charged the conduct as obstruction of justice and conspiracy, alleging that Judge Joseph used her official position and knowledge of the courthouse layout to shield the alien from detection and arrest by ICE. *See* Indictment, *United States v. Joseph*, No. 1:19-cr-10141 (D. Mass. Apr. 2019), available at: https://storage.courtlistener.com/recap/gov.uscourts.mad.209407/gov.uscourts.mad.209407.1.0_1.pdf; Reuters, "Reprimand recommended for Massachusetts judge accused of helping man evade ICE" (November 7, 2025), available at: https://www.reuters.com/legal/government/reprimand-recommended-massachusetts-judge-accused-helping-man-evade-ice-2025-11-07/.

3)  <u>Judge Hannah Dugan (Milwaukee County Circuit Court, Wisconsin, April 2025):</u> A sitting state court judge was indicted for obstruction of a federal proceeding (18 U.S.C. § 1505)

13

and concealing a person from arrest (18 U.S.C. § 1071) after allegedly helping a previously-deported Mexican national evade ICE agents at her courthouse by escorting him out a non-public side door and hallway, allowing him to leave the building and evade immediate arrest. *See* Indictment, *United States v. Dugan*, No. 2:25-cr-00089, ECF Doc. 6 (E.D. Wis. May 13, 2025), available at: https://storage.courtlistener.com/recap/gov.uscourts.wied.111896/ gov.uscourts.wied.111896.6.0.pdf; Reuters, "Trump administration's arrest of judge stirs debate over immigration courthouse enforcement" (May 13, 2025) available at: https://www.reuters.com/world/us/trump-administrations-arrest-judge-stirs-debate-over-immigration-courthouse-2025-05-13/. A jury convicted Judge Dugan of obstructing a federal proceeding in violation of 18 U.S.C. § 1505. *See* Jury Verdict, *United States v. Dugan*, No. 2:25-cr-00089, ECF Doc. 96 (E.D. Wis. Dec. 18, 2025), available at: https://storage.courtlistener.com/recap/gov.uscourts.wied.111896/gov.uscourts.wied.111896.96.0.pdf.

4) <u>Law clerks Jennifer Joma and Lauren Kelsey Morrow (Logan City Municipal Justice Court, Utah, June 2026)</u>: After Plaintiffs filed the present action, DOJ also indicted two former Utah state court clerks under 8 U.S.C. § 1324 and 18 U.S.C. § 1505 for harboring and helping illegal aliens evade arrest by using court records to identify illegal aliens, intercepting them inside the courthouse, and escorting them through secure hallways and out of a backdoor to evade waiting federal agents. *See* Press Release, U.S. Att'y's Office, Dist. of Utah, *Two Former Utah Court Clerks Arrested and Facing Federal Charges After Allegedly Helping Illegal Aliens Evade ICE Arrest* (June 10, 2026), available at: https://www.justice.gov/usao-ut/pr/two-former-utah-court-clerks-arrested-and-facing-federal-charges-after-allegedly-helping.

14

For Plaintiffs here, the current threat of prosecution is real and imminent. The Trump administration has repeatedly and explicitly prioritized enforcement of § 1324 against sanctuary-style obstruction by state and local officials. For example, Executive Order 14287, "Protecting American Communities from Criminal Aliens," 90 Fed. Reg. 18761 (May 2, 2025), directs the Attorney General and Secretary of Homeland Security to pursue "all necessary legal remedies and enforcement measures," against jurisdictions and officials that obstruct federal immigration enforcement. *Id.* at 18762. The Order specifically identifies sanctuary-style policies that impede federal immigration enforcement as targets for investigation and prosecution. It instructs the Attorney General and Secretary of Homeland Security to use "all necessary legal remedies and enforcement measures to end these violations," *id.*, including nullification efforts that violate federal criminal laws, "including those prohibiting obstruction of justice (18 U.S.C. 1501 *et seq.*), unlawfully harboring or hiring illegal aliens (8 U.S.C. 1324), conspiracy against the United States (18 U.S.C. 371), and conspiracy to impede Federal law enforcement (18 U.S.C. 372)." *Id.* at 18761.

DOJ and DHS have issued guidance and sanctuary jurisdiction lists that designate non-cooperating jurisdictions and threaten criminal prosecution of officials who shield removable aliens. These documents explicitly warn that state and local officials who shield removable aliens from detection or obstruct ICE operations will be subject to investigation and prosecution, including harboring under 18 U.S.C. § 1324 and conspiracy to commit an offense under 8 U.S.C. § 371. The guidance emphasized that "actions that impede federal efforts to enforce immigration law threaten public safety and national security. State and local jurisdictions must comply with applicable immigration-related federal laws." *See* DOJ Memorandum on Sanctuary Jurisdiction Directives (February 5, 2025), available at https://www.justice.gov/ag/media/1388531/dl?inline;

15

Press Release, "DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law" (May 29, 2025), available at: https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law; Press Release, "Justice Department Publishes List of Sanctuary Jurisdictions" (August 6, 2025), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

Under the customary standards governing standing to bring pre-enforcement challenges, then, Plaintiffs' dilemma is a concrete and particularized injury. *See, e.g., Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979) ("[W]hen fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge the statute") (internal citations and quotation marks omitted); *Mobil Oil Corp. v. Attorney Gen. of Virginia*, 940 F.2d 73, 75-76 (1991) (finding a case or controversy because oil company had shown an actual and well-founded fear that the Attorney General of Virginia, as provided for in the statute the company was challenging, would sue the company for injunctive relief for violating the statute, where the "Attorney General ha[d] not [] disclaimed any intention of exercising her enforcement authority").

In addition to this threat, compliance with the Act will jeopardize several Plaintiffs' eligibility for SCAAP funds and force them to divert scarce local resources to cover the shortfall, undermining their ability to maintain public safety operations. That is particularly true in light of President Trump's Executive Order 14287, which directed the Attorney General and Secretary of Homeland Security to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." 90 Fed. Reg. at 18761-62. By prohibiting sheriffs from honoring valid federal detainers, notifying ICE of custody, or

16

transferring custody to federal authorities, the Act would render Plaintiffs' jurisdictions non-cooperative, exposing them to the loss of these critical federal funds.

The Supreme Court has repeatedly held that this kind of irreconcilable dilemma creates a cognizable injury under Article III. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (pre-enforcement challenge where plaintiffs faced a choice between refraining from protected conduct or risking prosecution). This is especially true when the dilemma creates a threatened injury that is "certainly impending" or there is a "'substantial risk' that harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Being subject to a threat, an actual arrest, prosecution, or other enforcement action, however, is not a prerequisite to challenging the law. *See Steffel v. Thompson*, 415 U. S. 452, 459 (1974); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"). A showing of past enforcement against the same conduct is good evidence that the threat of enforcement is not "chimerical," and therefore establishes an injury. *Steffel*, 415 U.S. at 459. Likewise, the threat of liability is sufficiently concrete where, as here, "the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations," and "there is a real risk of complaints from, for example, political opponents." *Susan B. Anthony List*, 573 U.S. at 164.

An additional way the Act injures Plaintiffs is by forcing them to violate their oaths of office. On the one hand, if Plaintiffs comply with the Act, they will be complying with a state law that, on their view of the merits, is unconstitutional, and therefore will violate their oath to support the Constitution. *See, e.g., Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) ("A plaintiff's standing to bring a case does not depend upon his ultimate

success on the merits underlying his case.") (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). On the other hand, if Plaintiffs defy the Act, they have an actual and well-founded fear of state sanctions. The Supreme Court has overturned a federal statute where the plaintiff sheriff's Article III injury was that the statute forced him to violate his oath of office. *See Printz v. United States*, 521 U.S. 898 (1997) (overturning the Brady Act while leaving undisturbed the district court's conclusion, in *Mack v. United States*, 856 F. Supp. 1372, 1377 (D. Ariz. 1994), that "Mack is thus forced to choose between violating his oath or violating the Act, subjecting himself to possible sanctions. Mack has a sufficient stake in the outcome of the proceedings to justify standing …."). *See also Board of Education v. Allen*, 392 U.S. 236, 241 n.5 (1968) ("Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation. *Baker* v. *Carr*, 369 U.S. 186, 204 (1962).").

Put another way, the dilemma Plaintiffs face falls squarely under *Mobil*, 940 F. 2d at 75-76. If Plaintiffs violate the Act, like Mobil they will have an actual and well-founded fear of being sued for injunctive relief, as provided for in the Act, by the state Attorney General. If Plaintiffs comply with the Act, they will draw on themselves the continuing harm of 1) violating their oaths of office, 2) risking a cutoff of federal funding, and 3) incurring liability, and having a well-founded fear of prosecution, for federal crimes such as harboring and obstruction. The Act thus inflicts on Plaintiffs a classic and continuing Article III injury.

18

**b. Plaintiffs' injuries are fairly traceable to Defendants' conduct and will be redressed by injunctive relief.**

The injuries Plaintiffs are suffering are directly traceable to the Act and to Defendants' enforcement of it. And these injuries would be immediately redressed by injunctive relief. It is the Act which creates the dilemma that injures Plaintiffs, and its injunction would remove that injury.

**II.   Plaintiffs are likely to succeed on the merits because they can show that the Community Trust Act is preempted by federal law.**

Plaintiffs seeking preliminary injunctions must "make a 'clear showing' that they are likely to succeed at trial," but they "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

The Supremacy Clause provides that federal law is "the Supreme law of the land, … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. Thus, "[a] fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). When a state enactment "contradict[s]" federal law, it is "without effect." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824).

There are three kinds of preemption: express, conflict, and field preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990); *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492-93 (4th Cir. 2025). Two of these three forms of preemption are relevant here. Express preemption occurs when Congress has "clearly expressed an intention to preempt state law." *N. Va. Hemp & Agric.*, 125 F.4th at 492. Conflict preemption arises in two forms: impossibility preemption (where it is impossible for a party to comply with both state and federal law), and obstacle preemption (where the state law "stands as an obstacle to the accomplishment and

19

execution of the full purposes and objectives of Congress"). *Crosby*, 530 U.S. at 372-73 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

In addition, principles of intergovernmental immunity independently bar states from regulating or burdening the federal government or its operations. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819); *United States v. California*, 314 F. Supp. 3d 1114, 1132 (N.D. Cal. 2018), *aff'd in relevant part*, 921 F.3d 865 (9th Cir. 2019) (applying intergovernmental immunity to state laws that interfere with federal immigration enforcement).

The Act is preempted by federal law on four distinct grounds: conflict preemption (both impossibility and obstacle); express preemption; and intergovernmental immunity. The Court should grant this request for a preliminary injunction because Plaintiffs can make "a clear showing that they are likely to succeed at trial." *Pashby*, 709 F.3d at 321.

**a. The Community Trust Act is conflict-impossibility preempted.**

As shown above with respect to standing, in many likely situations Plaintiffs cannot comply with the Act without violating federal criminal law. Irrespective of the likelihood of prosecution, the impossibility of complying with both federal and state law shown by Plaintiffs' need to commit such conduct is a textbook example of conflict-impossibility preemption. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617-18 (2011) (holding that federal law preempted state law because federal law prohibited generic manufacturers from unilaterally altering their labels, while the state law claims depended on the existence of a duty to make such alterations); *see also Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488-89 (2013) (rejecting an argument that it was possible for generic drug makers to comply with both federal and state law by refraining from selling the relevant drugs because it would render impossibility preemption "all but meaningless").

### b. The Community Trust Act is conflict-obstacle preempted.

Obstacle preemption occurs "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Lozano v. City of Hazleton*, 724 F.3d 297, 303 (3d Cir. 2013) (citing *Arizona v. United States*, 567 U.S. 387, 399 (2012)). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), *quoted in Hines*, 312 U.S. at 67 n.20. The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. Preemption is "more easily found where states legislate in areas traditionally reserved to the federal government." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 73 (1st Cir. 1999), *and see Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (holding that state laws are invalid if they "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[o]se agencies of the federal government to discharge the duties, for the performance of which they were created").

First, the Act was intended to be, and certainly is, an obstacle to one of Congress's chief purposes in the immigration laws: that removable aliens be removed from the country. The Act's prohibitions on information-sharing and transfer of custody will make ICE's apprehension of removable aliens more difficult by interfering with the transfer of custody both inside and immediately outside of correctional facilities, forcing ICE to take costlier and less certain paths to removing criminal aliens. *See, e.g.*, ICE press release, *NYC sanctuary policies continue to shield criminal aliens* (Jan. 24, 2020, updated Jan. 24, 2025):

21

> When law enforcement agencies don't honor ICE detainers, these individuals, who often have significant criminal histories, are released onto the street, presenting a potential public safety threat. Any local jurisdiction thinking that refusing to cooperate with ICE will result in a decrease in local immigration enforcement is mistaken. Local jurisdictions that choose to not cooperate with ICE are likely to see an increase in ICE enforcement activity, as ICE the agency has no choice but to conduct more at-large arrest operations. A consequence of ICE being forced to make more arrests on the streets is the agency is likely to encounter other unlawfully present foreign nationals that wouldn't have been encountered had we been allowed to take custody of a criminal target within the confines of a local jail. Additionally, once these criminals are out on the street, confirming their whereabouts is often time consuming and resource intensive.

Available at: https://archive.ph/xIdCv.

Second, underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereigns for our system of government to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (cleaned up) (holding 8 U.S.C. § 1373 constitutional). The Act triggers obstacle preemption precisely because it undermines the principles of dual sovereignty and collaboration that are built into our constitutional system. *See Williamson v. Mazda Motor of Am., Inc.,* 562 U.S. 323, 329 (2011) (holding that obstacle preemption occurs when state law undermines a "significant federal regulatory objective"); *PPL EnergyPlus, LLC v. Nazarian,* 753 F.3d 467, 478 (4th Cir. 2014) (holding that obstacle preemption applies when a state substitutes its preferred policy approach for that enacted by the federal government).

22

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Exercising this power, Congress devised an intricate system of cooperation between federal, state, and local governments as a necessary element of the INA's scheme of immigration law enforcement. *See id.* at 411. For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),[4] codified in relevant part at 8 U.S.C. § 1373, Congress intended unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. *See Kearns v. Cuomo*, 415 F. Supp. 3d 319, 325 (W.D.N.Y. 2019) (describing congressional intent). The Senate Judiciary Committee Report accompanying IIRIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (quoted in *City of New York*, 179 F.3d at 32-33). Thus, in drafting § 1373, Congress intended a cooperative effort among local, state, and federal law enforcement on immigration.

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[5] Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," Section 434 of this

---

[4] Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (1996).

[5] Pub. L. No. 104-193, 110 Stat. 2105 (1996).

law (codified at 8 U.S.C. § 1644) is nearly identical to § 1373. This provision of PRWORA forbids any restrictions on the ability of state or local governments to send or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. *See Cty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376 (D.N.J. 2020) (describing scope of § 1644). Going further than the Senate Judiciary Committee Report on IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing Section 434: to bar *any* restriction on local police in their communications with ICE's predecessor INS regarding the whereabouts of illegal aliens (which includes notice of their release from detention).

> This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725 (Conf. Rep.) at 383 (1996) (quoted in *City of New York*, 179 F.3d at 32).

A third federal statute also shows Congress's intent to foster cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state or local law enforcement officials "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." *Id.* § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officials to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

By mandating non-cooperation, the Act necessarily frustrates the congressional goal of cooperation. In the Fourth Circuit, similar obstacles to cooperation with federal objectives have been held to be preempted. *See North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 309 (4th Cir.

24

2010) (holding that state public nuisance claims against federal power plants were preempted because they interfered with the state-federal permitting and enforcement framework codified in the Clean Air Act).

Third, by making Maryland a "sanctuary state" where illegal aliens can expect protection from federal immigration law enforcement, the Act functions as a magnet to illegal immigration itself. This undermines Congress's objective of obtaining "operational control" of the border, defined as "the prevention of all unlawful entries into the United States," not just by terrorists but by all illegal aliens. Secure Fence Act of 2006 § 2(b), Pub. L. No. 109-367, 120 Stat. 2638, 2638-39 (codified as a note to 8 U.S.C. § 1701).

### c. The Community Trust Act is expressly preempted.

Plaintiffs are also likely to succeed on the merits because the Supremacy Clause prohibits state laws that are expressly preempted by federal statute. In enacting 8 U.S.C. §§ 1373 and 1644, both provisions in the INA, Congress made explicit its intent to preempt sanctuary-style laws such as the Act.

Section 1373(a) provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [Department of Homeland Security] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 1373(b) also prohibits any restriction on the maintenance or exchange of such information with other law enforcement entities. Meanwhile, section 1644 contains nearly identical language, providing that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [Department of Homeland Security] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

The Act directly violates these express commands. It prohibits Plaintiffs and other local law enforcement officers from (1) notifying federal immigration authorities that an individual is in custody, (2) providing federal immigration authorities with information obtained in the course of their duties unless required by a valid court order (expressly excluding documents issued by DHS or DOJ), and (3) transferring an individual to federal immigration authorities unless presented with a narrow judicial warrant that excludes administrative warrants. *See* Md. Code Ann., Corr. Servs. § 8-805(b)(2); Crim. Proc. § 5-104(b)(2). These prohibitions fall squarely within what §§ 1373 and 1644 expressly preempt.

**d. The Community Trust Act unlawfully regulates the federal government.**

Plaintiffs are also likely to succeed on the merits because the Act violates basic principles of intergovernmental immunity by unlawfully regulating the federal government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). The Act does precisely that by directing state and local law enforcement officials not to arrest or detain an individual pursuant to a civil immigration detainer (except in narrow circumstances), and not to honor administrative warrants issued by DOJ or DHS, while permitting judicial warrants to be honored. *See* Md. Code Ann., Corr. Servs. § 8-805(b)(2); Crim. Proc. § 5-104(b)(2). Congress, however, has chosen to establish a largely civil, rather than a criminal, immigration system, in which the use of a judicial warrant for civil immigration enforcement is not contemplated. *See* 8 U.S.C. §§ 1226(a), 1231(a). The Act's judicial-warrant requirement penalizes this choice, making it the ground for burdening the federal government's enforcement efforts, and is thus a regulation of the federal government's manner of operation.

### III.    Plaintiffs' will suffer irreparable harm if the Act is implemented

The dilemma the Act places Plaintiffs in—hazarding either liability and lawsuits for violating the Act or liability and criminal prosecution for violating federal criminal law—itself constitutes harm that is irreparable because it cannot be remedied by money damages or any other form of post-judgment relief. *See, e.g., Steffel v. Thompson*, 415 U.S. 452, 462–63 (1974) (observing that "a federal court may, in appropriate circumstances, enjoin  future state criminal prosecutions under [an] unconstitutional Act" (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Susan B. Anthony List*, 573 U.S. at 165 (holding that a credible threat of prosecution gives rise to irreparable harm warranting pre-enforcement relief); *Texas v. United States*, 201 F. Supp. 3d 810, 835 (N.D. Tex. 2016) ("As Defendants have conceded the conflict between the Guidelines and Plaintiffs' policies, and Plaintiffs have identified a number of statutes that conflict, the Court concludes Plaintiffs have sufficiently demonstrated a threat of irreparable harm.").

In addition, compliance with the Act will cause Plaintiffs to suffer the imminent loss of critical federal funding under SCAAP. Several Plaintiffs' jurisdictions, including Harford, Frederick and Washington Counties, have received hundreds of thousands of dollars in SCAAP reimbursements for the costs of incarcerating removable aliens. *See* Ex. 2, Gahler Dec. ¶ 11 ($500,000 between 2018 and 2023); Ex. 3, Jenkins Dec. ¶ 9 ($352,000 between 2018 and 2023); Ex. 4, Albert Dec. ¶ 9 ($350,000 between 2018 and 2024). Compliance with the Act's prohibitions on honoring detainers, notifying ICE, and transferring custody will render Plaintiffs' jurisdictions non-cooperative with federal immigration enforcement, exposing them to the suspension or termination of these funds. *See* Exec. Order 14287, "Protecting American Communities from Criminal Aliens," 90 Fed. Reg. 18761 (May 2, 2025). The threatened loss of substantial federal funding that is essential to the operation of Plaintiffs' jails and law enforcement operations constitutes irreparable harm. *See City of Chicago v. Sessions*, 888 F.3d 272, 280–81 (7th Cir.

27

2018) (threatened loss of federal grants tied to immigration enforcement constitutes irreparable harm to city operations); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (threatened loss of federal Medicaid funds constitutes irreparable harm).

Third, the Act will require Plaintiffs to release dangerous criminals (including what the Act calls "convicted individuals") into the community, directly threatening public safety. Although the Act exempts convicted felons, registered sex offenders, those sentenced to state incarceration, or those with out-of-state sentences of at least five years from some of its prohibitions, Plaintiffs are still barred from detaining or prolonging the detention of such individuals for immigration purposes or at ICE's request unless a narrow judicial warrant is presented. Md. Code Ann., Corr. Servs. § 8-805(b)(1). This will force Plaintiffs to release individuals who are subject to mandatory federal removal or who pose ongoing threats to the community. *See*, *e.g.*, Ex. 2, Gahler Dec. ¶ 7 (discussing two scenarios where aliens will be released without cooperation with ICE as a result of the Act's prohibitions). The resulting increase in crime and risk to Maryland residents is a classic form of irreparable harm. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (observing that the pretrial release of dangerous criminals "presents a demonstrable danger to the community"); *Schall v. Martin*, 467 U.S. 253, 264–65 (1984) (observing that an increase in juvenile crime threatens public safety and inflicts a grave harm on society).

## IV. The balance of the equities and the public interest favor granting Plaintiffs preliminary relief.

"Once an applicant satisfies the first two factors" justifying preliminary relief, the traditional inquiry requires a holistic assessment of "the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, a holistic assessment of the equities and the public interest justify temporary

relief since "the likelihood of chaos" resulting from a state "enforcing its separate immigration regime is apparent." *South Carolina*, 720 F.3d at 533.

Having shown a clear likelihood of success on the merits and immediate irreparable harm, Plaintiffs easily satisfy the final two *Winter* factors. The balance of the equities tips decidedly in Plaintiffs' favor, and the public interest strongly supports preliminary relief. A preliminary injunction would simply preserve the *status quo ante*—the longstanding, congressionally encouraged cooperation between Maryland sheriffs and federal immigration authorities—while this litigation proceeds. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017). It would inflict no cognizable harm on Defendants, while preventing grave and immediate harm to Plaintiffs, Maryland communities, and the principle of federal supremacy.

The public interest likewise weighs in favor of a preliminary injunction. First and foremost, the public is never served by the continued enforcement of an unconstitutional law. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.") (internal quotations omitted).

Second, the public has a compelling interest in its own safety. The Act will require the release of criminal aliens who would otherwise be transferred to ICE custody. The declarations of Plaintiffs Gahler, Jenkins, and Albert describe how the Act will force the release of these individuals into Maryland communities, increasing the risk of crime and victimization. Ex. 2, Gahler Dec. ¶¶ 7-9; Ex. 3, Jenkins Dec. ¶ 6; Ex. 4, Albert Dec. ¶ 6. A preliminary injunction will prevent this harm and allow Plaintiffs to continue the cooperative practices that have long

29

enhanced public safety in Maryland. Ex. 2, Gahler Dec. ¶¶ 3-5; Ex. 3, Jenkins Dec. ¶ 3-4; Ex. 4, Albert Dec. ¶ 3-4.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter a preliminary injunction barring Defendants from implementing the Maryland Community Trust Act for the pendency of this litigation.

Dated: August 11, 2026

Respectfully submitted,

s/ Christopher J. Hajec
Christopher J. Hajec*
Matt A. Crapo*

s/ Mateo Forero-Norena
Mateo Forero-Norena (Bar No. 30768)

Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
chajec@fairus.org
mcrapo@fairus.org
mforero@fairus.org

* admitted *pro hac vice*

*Counsel for Plaintiffs*