**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(BALTIMORE DIVISION)**

| | |
|---|---|
| JEFFREY R. GAHLER, in his official capacity as Sheriff of Harford County, Maryland, and in his individual capacity, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES MOORE, Governor, in his official capacity, *et al.*,<br><br>Defendants. | Civil Action No. 1:26-cv-02057 |

**MEMORANDUM IN REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Christopher J. Hajec*
Matt A. Crapo*
Mateo Forero-Norena (Bar No. 30768)
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
chajec@fairus.org
mcrapo@fairus.org
mforero@fairus.org

* admitted *pro hac vice*

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT........................................................................................................ 1

I. Plaintiffs have both capacity to sue under Maryland law and a viable cause of action..... 4

II. Dismissal under Rule 12(b)(1) is inappropriate. ........................................................... 7

III. The Community Trust Act is obstacle preempted. ....................................................... 11

IV. The Community Trust Act is impossibility preempted. ................................................ 15

V. The Community Trust Act is expressly preempted ...................................................... 16

VI. Plaintiffs have prudential standing to bring their intergovernmental immunity claim, and the Community Trust Act violates intergovernmental immunity. .................................. 17

VII. Plaintiffs have established irreparable harm. ............................................................ 18

VIII. The balance of equities and the public interest mean that full preliminary injunctive relief is necessary and proper. ....................................................................................... 19

CONCLUSION........................................................................................................ 20

Plaintiffs Jeffrey Gahler, Scott Adams, Brian Albert, Donald Baker, Richard Cox, Matthew Crisafulli, James DeWees, Joseph Gamble, Steven Hall, Dennis Hickman, Gery Hofmann, Ronald Howard, Charles Jenkins, Michael Lewis, Bryson Meyers, James Phillips, and Craig Robertson ("Plaintiffs"), by counsel, respectfully submit this Memorandum In Reply in Support of their Motion for a Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss. ECF Doc. 7.

## INTRODUCTION

Defendants present a long list of alleged deficiencies in Plaintiffs' complaint and their motion for a preliminary injunction. None of these points achieves its purpose. In an effort to bar Plaintiffs at the door, Defendants give a misleading account of Maryland law on capacity to sue, misstate the requirements of *Ex parte Young*, and pass over in silence a leading Fourth Circuit case that establishes Plaintiffs' standing. On the merits of Plaintiffs' claims, Defendants inappositely urge that the Tenth Amendment and the anti-commandeering doctrine somehow prevent the Maryland Community Trust Act (the Act) from being obstacle preempted, though Defendants do not dispute that it is an obstacle to congressional purposes. Defendants are also forced to misinterpret the Act's requirements in a way contraindicated by one Defendant, the Maryland Attorney General, in his own Guidance on the Act to deny both that the Act directly conflicts with the federal anti-harboring statute and that Plaintiffs face a dilemma that will cause them continuing irreparable harm. This case should not be dismissed, and the motion for a preliminary injunction should be granted.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518,

524 (4th Cir. 2013). To obtain a preliminary injunction, the moving parties "'must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). "The first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A defendant seeking dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction may (1) "attack[] the veracity of the allegations contained in the complaint or" (2) "contend[] that, even assuming that the allegations are true, the complaint fails to set forth facts upon which jurisdiction is proper." *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). To the extent Defendants argue that the Plaintiffs failed to allege facts sufficient to establish subject-matter jurisdiction, Plaintiffs are "afforded the same procedural protection as [they] would receive under a Rule 12(b)(6) consideration" and "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted).

> [W]hen the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts. And when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous.

*Kerns*, 585 F.3d at 193. When "the relevant facts—for jurisdictional and merits purposes—are inextricably intertwined," dismissal under Rule 12(b)(1) is inappropriate, and the court "should assume jurisdiction and assess the merits of the claim." *Id.* at 195.

Under Federal Rule of Civil Procedure 12(b)(6), the court "is obliged to assume all well-pleaded factual allegations in the complaint to be true and determine whether, viewed in the light most favorable to the plaintiff, those factual allegations 'plausibly give rise to an entitlement to relief." *Harrold v. Hagen*, 174 F.4th 393, 400 (4th Cir. 2026) (quotation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Twombly*, 550 U.S. at 555-56 (recognizing that factual allegations must be accepted as true "even if doubtful in fact" and that a well-pleaded complaint may proceed "even if it appears that recovery is very remote and unlikely") (citations omitted).

By the nature of these standards, if Plaintiffs establish that they should be granted a preliminary injunction, they also establish that their case should not be dismissed. The inference does not go the other way, however. Even if this Court were to find some lack in Plaintiffs' current evidence for injunctive relief, and deny a preliminary injunction solely on that basis, Defendants' motion to dismiss, in which the factual allegations in the complaint are assumed true, should still be denied. Indeed, to the extent that Defendants attack the veracity of Plaintiffs' allegations pertinent to standing by claiming that it is merely "speculative" whether ICE will stake out or visit Plaintiffs' correctional facilities in response to the Act, thus forcing Plaintiffs to commit acts of harboring if they obey the Act, Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Motion to Dismiss (Defs' Br.) at 8-9, or argue that the Attorney General's interpretation of the Act's prohibition on transfer of custody differs from Plaintiffs' and would not require these acts of harboring, *id.* at 12, these allegations are inextricably entwined with Plaintiffs' merits claims of impossibility preemption and

irreparable harm. *See* Complaint ¶ 73; Plaintiffs' Memorandum in Support of their Motion for a Preliminary Injunction (Pls' PI Br.) at 1 ("The Act forces Plaintiffs—elected Maryland Sheriffs—into a dilemma: (1) comply with the Act and risk both federal criminal liability (for example, under 8 U.S.C. § 1324) and loss of federal funding; or (2) defy the Act and face civil enforcement by the Maryland Attorney General or private plaintiffs. This dilemma confers Article III standing, creates imminent irreparable harm, and renders the Act conflict-preempted under the Supremacy Clause."). For this reason, absent discovery on Plaintiffs' jurisdictional allegations, Defendants' motion for dismissal for want of jurisdiction is premature and should be denied under *Kerns*, 585 F.3d at 195.

## I. Plaintiffs have both capacity to sue under Maryland law and a viable cause of action.

Defendants ignore directly controlling precedent in asserting that Plaintiffs lack capacity under Maryland law to bring this suit. Defs' Br. at 15-16. Although Maryland law vests the Attorney General with authority to represent and defend state officials' legal interests, Maryland courts have long recognized that a public official, like Plaintiffs here, "faced with a dilemma either in refusing to act under a statute he believes to be unconstitutional, or in carrying it out and subsequently finding it to be unconstitutional ha[ve] standing to bring a declaratory judgment action to challenge the validity of the statute." *State ex rel. Attorney Gen. v. Burning Tree Club, Inc.*, 481 A.2d 785, 793 (Md. 1984); *see id.* at 789-93 (discussing several cases applying this "dilemma doctrine").

Here, Plaintiffs are properly seeking such declaratory and further necessary or proper injunctive relief under federal law. *See* 28 U.S.C. §§ 2201, 2202. In doing so, they assert the very sort of dilemma described in the dilemma doctrine. "The Act forces Plaintiffs—elected Maryland Sheriffs—into a dilemma: (1) comply with the Act and risk both federal criminal liability (for example, under 8 U.S.C. § 1324) and loss of federal funding; or (2) defy the Act and face civil

enforcement by the Maryland Attorney General or private plaintiffs." Pls' PI Br. at 2; *see also id.* at 7, 16-19, 27 (discussing dilemma); Complaint at ¶¶ 50, 67-68 (alleging this dilemma). Thus, Plaintiffs' claims fall squarely within that doctrine.

Defendants' reliance on *Duckworth v. Deane*, 393 Md. 524 (2006), is misplaced. *Duckworth* did not address the "dilemma doctrine" or deal with a situation where public officials, like Plaintiffs here, assert that a state statute is unconstitutional under the federal Constitution. *Id.* at 529 (stating that the case "present[ed] no issue as to the constitutionality" of a state statute and "concern[ed] only the matter of intervention."). *Duckworth*, 393 Md. at 529.

Plaintiffs have the capacity to sue under the dilemma doctrine and federal law. In any event, insofar as Plaintiffs bring this suit in their individual capacities, they are not subject to Md. Code Ann., State Gov't § 6-106.

As for Defendants' argument that Plaintiffs lack a cause of action against the Attorney General under *Ex parte Young* because the Attorney General has not yet explicitly threatened them with imminent lawsuits, Defs' Br. at 16-18 even the case they rely on, *McBurney v. Cuccinelli*, 616 F.3d 393 (4th Cir. 2010), actually holds that "[t]he requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Id.* at 399 (quotation marks omitted). And the threat need not be explicit or particularized. True, *McBurney*, after finding that the Attorney General lacked the required special relation to enforcement, held in the alternative that "even were we to find a special relation, we cannot apply *Ex parte Young* because the Attorney General has not acted or threatened to act." *Id.* at 402. That is merely to say, however, that, given the merely general connection to law enforcement that the Virginia Attorney General had, even if the court had (wrongly) concluded that that connection constituted a special

relation to enforcement, that general connection alone, without any history of him or his advice being involved in enforcement, would not constitute a threat to enforce. That is surely true. But here, the Attorney General has a special relation to enforcement of the Act, because he is specifically authorized by the Act to enforce it, Md. Code Ann., Corr. Servs. § 8-805(e), and he has also issued guidance telling sheriffs and others what conduct under this law is expected of them. Maryland Attorney General, Local Enforcement of Federal Immigration Law (June 22, 2026), available at https://oag.maryland.gov/FederalActionsResponse/Documents/pdfs/Law%20Enforcement%20Immigration%20Guidance%2006.22.2026%20Update%20%28FINAL%29.pdf (Guidance). These facts sufficiently imply that enforcement is threatened, without the need for an express, targeted threat to Plaintiffs. *See, e.g., Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004) (finding threat of prosecution by state Attorney General for violation of a state statute sufficient under *Ex parte Young*, in the absence of any explicit threat, based on the Attorney General's enforcement power under state law); *Mobil Oil Corp. v. Att'y Gen. of Commonwealth of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (finding the Eleventh Amendment did not bar suit where the Virginia Attorney General had not expressly threatened to enforce the challenged law because, given her duty to enforce it, its passage by the Virginia General Assembly was a sufficient implicit threat).

Indeed, were such an express or targeted threat required, state officials, even those with a special relation to the enforcement of an unconstitutional state law, could dodge pre-enforcement challenges to that law merely by refraining from making their intentions to enforce it known. But such lawsuits are precisely what the *Ex parte Young* doctrine was designed to protect. *See, e.g., Terrace v. Thompson*, 263 U.S. 198, 216 (1923) (holding that, under *Ex Parte Young*, plaintiffs "are not obliged to take the risk of prosecution, fines and imprisonment and loss of property in

order to secure an adjudication of their rights."); *Ex parte Young*, 209 U.S. 123, 163-65 (1908) (justifying pre-enforcement challenges on the ground that waiting to raise a constitutional defense in a state prosecution can be an inadequate remedy at law).

## II. Dismissal under Rule 12(b)(1) is inappropriate.

Citing *Mobil, supra*, Plaintiffs established in their opening brief in support of a preliminary injunction that they suffer an injury sufficient for standing to challenge the Act because it places them in a dilemma: either disobey the Act and face injunction suits by the Maryland Attorney General or obey it and incur criminal liability, and risk prosecution, for acts in violation of the federal anti-harboring statute and other federal obstruction statutes, face the loss of federal funding, and violate their oaths of office. Pls' PI Br. at 18.

Curiously, Defendants never mention *Mobil*, which decides standing in this case, with the only difference being that *Mobil* concerned a state law that the Virginia Attorney General was empowered to enforce with injunction suits, *Mobil*, 940 F.2d at 75, and the Act is a Maryland law that the Maryland Attorney General is authorized to enforce with injunction suits. As in *Mobil*, standing exists here because the Attorney General's enforcement authority, the use of which has not been explicitly disclaimed, creates a case or controversy with the Attorney General:

> The gravamen of the district court's opinion and the Attorney General's argument is that unless Mobil can show that the Attorney General will enforce the statute, there is no dispute with the Attorney General. The Attorney General has not, however, disclaimed any intention of exercising her enforcement authority. In short, Mobil should violate the law and wait to see what happens; the Attorney General knows, but will not say, and until she does, there is no dispute.

*Id.* at 76 (footnote omitted). Here, too, obedience to the state law creates its own harms—Plaintiffs' forced violation of their oaths of office, foreseeable loss of funding, and incurring federal criminal liability.

> We see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced. Mobil has certainly alleged "an actual and

> well-founded fear" that the law will be enforced, and has in fact "self-censored" itself by complying with the statute, incurring harm all the while.

*Id.*

Defendants claim that being forced to violate one's oath of office is not a cognizable injury, though the Supreme Court has held that it is, *Board of Education v. Allen*, 392 U.S. 236, 241 n.5 (1968), because subsequent Supreme Court opinions may seem to cast that holding into doubt. Defs' Br. at 14-15. Yet it is not for this Court or courts of appeals to overturn the Supreme Court on such a basis. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Defendants next try to distinguish *Allen* on the ground that, in that case, the plaintiffs faced greater injuries for disobeying the state law than they claim Plaintiffs face here. *Id.* Here, though, as shown, Plaintiffs face sufficient injury from noncompliance under *Mobil*, and in *Allen*, 392 U.S. at 241 n.5, the *only* harm alleged by the plaintiffs from obeying the law was that doing so would force them to violate their oaths of office. Here, Plaintiffs demonstrate that harm—as is sufficient—and more besides.

The county does receive SCAAP funds, but they defray incarceration costs, *see* https://bja.ojp.gov/program/state-criminal-alien-assistance-program-scaap/overview ("SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens…."), so denial would be a direct loss to Plaintiffs. Defendants claim the loss is "speculative," but the current administration has repeatedly sought to cut off funding to sanctuary jurisdictions, *see*, *e.g.*, *City & Cty. of S.F. v. Trump*, 816 F. Supp. 3d 1017, 1029-31 (N.D. Cal. 2026) (denying a motion to dismiss because the Executive Orders

directing agencies to suspend or terminate funding or grants to sanctuary jurisdictions are sufficient to establish pre-enforcement standing).

Plaintiffs also allege—and, in support of a preliminary injunction, show—that, if they obey the Act, they will be forced to commit harboring and violate other federal criminal obstruction statutes. Pls' PI Br. at 8-12. If, as the Act requires, they refuse to provide release dates of an inmate in response to an immigration detainer, they will be concealing whether the inmate is in the jail or outside of it, and thus be "conceal[ing]" the inmate either in a building (the jail) or a place (outside the jail). *Id.* at 8 (citing 8 U.S.C. § 1324(a)(1)(A)(iii)). The Act thus forces them into the inescapable dilemma of either disobeying state law or violating federal criminal law.

Defendants broadly assert that whether the Act will force Plaintiffs to violate federal criminal law is "speculative." Defs' Br. at 8. In fact, the Act has already placed Plaintiffs in the dilemma they allege. *See* Doc. No. 14-1, Declaration of Michael Cronise (stating that, since the Act went into effect, Sheriff Jenkins's correctional facility has received five such detainers from ICE and was permitted under the Act to comply with only one of them). Also, Plaintiffs have demonstrated ICE's propensity to stake out jails in sanctuary jurisdictions both in Maryland and elsewhere in response to detainer noncompliance. *See* Pls. PI Br. at 8-10 (citing many such instances). It is thus more than speculative that ICE is likely to stake out or seek entry to Plaintiffs' jails, too, in response to such noncompliance. In turn, Plaintiffs have shown, they will be forced to commit further acts of harboring and obstruction if they are to avoid violating the Act, such as preventing ICE agents from entering their jails, delaying the timing of releases to avoid transferring custody to ICE agents waiting outside, and walking aliens away from ICE agents requesting custody. Pls' PI Br. at 10-12 (citing declarations). Defendants claim that some of these

acts would proceed from a faulty interpretation of the law, at least according to the Attorney General, Defs' Br. at 12, but nowhere explain how, for example, the Act would permit Sheriff Gahler to let ICE agents to enter his jail to assume custody of an alien inside (thus transferring custody), or allow Sheriffs Jenkins or Albert to transfer custody by releasing an alien outside in the presence of an ICE agent who would immediately assume custody. Defendants do not give, much less support, any interpretation of "transfer of custody" in the Act (or in any other context) under which the knowing release of custody by one officer in the presence of another officer seeking custody, immediately followed by the assumption of custody by the second officer, somehow fails to be a transfer of custody. Indeed, the Attorney General, by warning sheriffs that detainer compliance may lead to a "de facto 'transfer,'" appears to agree with Sheriffs Jenkins and Albert on this point. Pls' PI Br. at 11; Guidance at 7-8.

Defendants also claim that Plaintiffs would lack the *mens rea* required for harboring under *Reyes v. Waples Mobile Home Park Ltd.*, 91 F.4th 270 (4th Cir. 2024), because their intent would be to comply with the Act, not to harbor the alien from ICE. Defs' Br. at 13. But intending to comply with the Act's prohibition on transfer of custody involves intending to prevent the assumption of custody by ICE, because that assumption of custody is part of any transfer. So, whether Plaintiffs would be heeding the Attorney General's Guidance and refusing to comply with detainers to avoid a de facto transfer, or altering the timing of releases to prevent a transfer of custody to ICE agents waiting outside their jails, they would have the intent to "to aid an undocumented immigrant in hiding from the authorities." *Reyes*, 91 F.4th at 277.

Defendants then claim that, even if the Act forced Plaintiffs to commit such criminal acts, the threat of federal prosecution would be "imaginary." Defs' Br. at 14. The spate of recent prosecutions for harboring-style violations by public officials and the repeated strong warnings

of federal enforcement authorities to the same set forth by Plaintiffs, Pls. PI Br. at 12-15, belie that claim, and distinguish this case from the mere "generalized fears and concerns" found insufficient in *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020). Enforcement need not be certain; rather, Plaintiffs need only have "an actual and well-founded fear of prosecution." *Id.*; *Mobil*, 940 f.2d at 75-76 (same). Plaintiffs easily meet that standard.

In sum, the dilemma the Act places Plaintiffs in is more than enough under *Mobil*, *Allen,* and *Md. Shall Issue* to constitute an injury-in-fact sufficient for standing, and enjoining the Act would redress Plaintiffs' injuries by removing this dilemma. Plaintiffs have standing.

## III. The Community Trust Act is obstacle preempted.

Defendants do not deny that the Act is an obstacle to the congressional purpose that removable aliens be removed, or to any of the other congressional purposes Plaintiffs identify. Pls' PI Br. at 21-25. Rather, Defendants carefully claim that the Act is not an "unconstitutional obstacle." Defs' Br. at 22. Yet, according to the doctrine of obstacle preemption, a state law that stands as an obstacle to congressional purposes in a law is "to the contrary" of that law and thus unconstitutional under the Supremacy Clause. U.S. Const. Art. VI, cl. 2; *e,g,, Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Were it otherwise, of course, states opposed to federal purposes would be able to adopt, and surely would adopt, all manner of stratagems to frustrate those purposes, and federal supremacy would exist on paper only, with Congress a paper tiger endlessly hampered in its attempts to achieve real results. As a but-for cause, the Act makes the enforcement of federal immigration laws decidedly more difficult. That makes the Act both an obstacle and, despite Defendants' protestations, an unconstitutional obstacle.

The Tenth Amendment certainly does not provide an escape hatch from preemption. Nor does the anti-commandeering doctrine, which prohibits federal laws that directly command states or state officers, have a penumbra that overrides the preemptive effect of laws, such as the federal

immigration laws at issue here, that do *not* directly command states or state officers. The anti-commandeering doctrine may be an admirable deduction from the Constitution's history and presuppositions, but it does not appear in the constitutional text; the Supremacy Clause does.

Defendants appeal to the anti-commandeering doctrine and the Tenth Amendment, Defs' Br. at 24, but that doctrine, as explained by the Supreme Court in *Murphy v. NCAA*, 584 U.S. 453 (2018), stems from the premise that the federal government governs individuals, not states. *Id.* at 472. The Supremacy Clause provides that federal law is supreme, anything to the contrary of it in state law notwithstanding. U.S. Const. Art. VI, cl. 2. The preemption of a state law that makes it more difficult for the federal government to govern individuals—such as illegal aliens— through its laws obviously does not violate the anti-commandeering doctrine, for the federal laws in question properly govern individuals. Of course, the upshot of the obstacle-preemption argument here is that certain state laws—that is, sanctuary laws—are of no effect. But that is the upshot of all valid obstacle-preemption arguments. That states are stymied when they make laws that interfere with federal purposes, and thus are to no effect, does not mean the states are commandeered.

Nor are powers to make preempted laws reserved to the states in the Tenth Amendment. The Tenth Amendment sets forth a method of determining whether given powers are reserved to the states (or the people) by the Constitution: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Thus, under the Tenth Amendment, before it can be decided that a given power is reserved to the states, it must be determined whether that power is delegated to the federal government by the Constitution, and whether it is prohibited to the states by the

Constitution. Only if the answer to both questions is in the negative does the Tenth Amendment reserve that power to the states.

Claiming that the Tenth Amendment blocks the Act from being obstacle preempted, while conceding that the Act makes federal immigration law enforcement more difficult, ignores this method of decision. Following that method would involve asking whether a power to make laws that stand as obstacles to the purposes of federal laws is prohibited to the states. Of course, that power is prohibited to the states by the Supremacy Clause, as interpreted by the Court's obstacle preemption cases. *See, e.g., Murphy,* 584 U.S. at 471 ("[T]he Constitution indirectly restricts the States by granting certain legislative powers to Congress, see Art. I, §8, while providing in the Supremacy Clause that federal law is the 'supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding,' Art. VI, cl. 2."). Since the power to make laws that are obstacles to federal aims is prohibited to the states, the power to make the Act, which is an obstacle to federal aims, is not reserved to the states by the Tenth Amendment.

Defendants also cite *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 277 (4th Cir. 2025), for the proposition that Congress should not be supposed to have intended a "radical change in the federal-state balance" unless it had spoken "with a much clearer voice" than it has in the Immigration and Nationality Act (INA), and "displac[ing] the Assembly's authority to define the scope of its officers' authority" would be such a radical change. Defs' Br. at 25. But *GenBioPro* turned on the textual meaning of federal law; it could only have preemptive effect if it meant what the plaintiff claimed it meant, and thus evinced a congressional purpose to which the state law the plaintiff challenged was an obstacle. But the plaintiff's support for its asserted meaning was tenuous at best. *See GenBioPro*, 144 F.4th at 278 ("Appellant attempts to assemble a preemption

theory out of statutory scraps and fragments…”). By contrast, the congressional purposes Plaintiffs identify in their memorandum in support of their motion for a preliminary injunction are nothing if not clear, and usually stated at length in the statutory history. Pls’ PI Br. at 21-25. Similarly, defendants quote with approval the Fourth Circuit’s statement in *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025), that “a court should not find conflict preemption unless preemption was ‘the clear and manifest purpose of Congress.’” (quoting *Arizona*, 567 U.S. at 400). But the court immediately went on to say that “[s]tated more clearly, courts should not seek out conflicts where none clearly exist.” *Id.* Here, the obstacles that Plaintiffs show the Act presents to various stated or obvious purposes of federal immigration laws are unmistakable. Pls’ PI Br. at 21-25.

Indeed, Defendants seem here to be presupposing a presumption against preemption that has sometimes been employed by the Supreme Court. *See, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). If so, any such presumption is easily overcome here. First, a leading case setting forth this presumption held that, in cases of obstacle preemption, the presumption is *ipso facto* surmounted. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (“[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. Such a purpose may be evidenced in several ways. . . [For example,] the state policy may produce a result inconsistent with the objective of the federal statute.”); *see also Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000) (“Assuming, *arguendo*, that some presumption against preemption is appropriate, we conclude, based on our analysis below, that the state Act presents a sufficient obstacle to the full accomplishment of Congress’s objectives under the federal Act to find it preempted.”).

Second, "an 'assumption' of nonpre-emption is not [even] triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (quoting *Rice, supra*); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (finding that the presumption against preemption did not apply to fraud on the Federal Drug Administration because it is not an area of traditional state regulation). The question of what happens to removable aliens has always and quintessentially been in the purview of the federal government. *See, e.g., Arizona v. United States*, 567 U.S. 387, 394 (2012) (recognizing that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens") (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)). There is no traditional state power to decide this question, and certainly not to decide it inconsistently with how the federal government has decided it. That Maryland has intruded into an area of federal concern prevents even the application of any presumption against preemption in this case.

## IV. The Community Trust Act is impossibility preempted.

It cannot be denied (nor do Defendants deny) that the Act, like other sanctuary laws, is designed to shield illegal and removable criminal aliens from removal from the United States. It should come as no surprise, then, that, as Plaintiffs have shown, Pls' PI Br. at 8-12, the Act compels acts of harboring, that is, the criminal shielding of such aliens from removal, by those forced to carry it out.

In attempting to rebut Plaintiffs' showing, Defendants merely refer to their arguments in their discussion of standing, Defs' Br. at 25-26, in which they claim that whether Plaintiffs would be forced by the Act to commit acts of harboring is "speculative," and argue that the Act, as interpreted by the Attorney General, would not require Plaintiffs to commit acts of harboring.

Defs' Br. at 8, 12-13. On the contrary, Plaintiffs have shown that the Attorney General, by speaking of "de facto 'transfers,'" signals agreement with Plaintiffs' position that, when one officer knowingly releases an individual from custody in the presence of another officer waiting to take custody, who then does take custody, a transfer of custody has taken place. Pls' PI Br. at 11. Defendants certainly provide no reason to doubt this understanding of what constitutes a "transfer" under the Act or in any other context. For the reasons stated above with respect to standing, then, and those given in Plaintiff's opening brief, Plaintiffs have shown impossibility preemption because "in many likely situations Plaintiffs cannot comply with the Act without violating federal criminal law." Pls' PI Br. at 20. Defendants fail to show otherwise.

## V. The Community Trust Act is expressly preempted.

Defendants claim that Plaintiffs' express preemption claim fails because 8 U.S.C. §§ 1373 and 1644 violate the anti-commandeering doctrine. Defs. Br. at 20-21. Yet these provisions, though couched as prohibitions on what laws states may not pass, do not commandeer the states, because they create a federal right in all public officials to give information to ICE. *See Murphy*, 584 U.S. at 478-79 (explaining that laws are not commandeering if it is possible to read them as establishing a federal right). In so doing, they do not contravene the principle the anti-commandeering doctrine is based on: that the federal government governs individuals, not states. Federal, state, and local officials are, after all, individuals, and neither Defendants nor the Court in *Murphy* demonstrated that the Constitution presupposes that Congress cannot give them rights, as opposed to commanding their activity.

And release dates are "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" and "information regarding the citizenship or immigration status, lawful or unlawful, of an alien in the United States" that public officials have a right to share with

ICE under, respectively, §§ 1373 and 1644. Under the INA, Congress has directed that DHS "shall take into custody any alien" who falls within one of the enumerated criminal or terrorism-related grounds "when the alien is released" from criminal custody. 8 U.S.C. § 1226(c)(1). Congress has also directed that DHS "shall detain" aliens subject to final orders of removal during a 90-day "removal period," which begins—for aliens confined in criminal custody—on "the date the alien is released from detention or confinement." 8 U.S.C. § 1231(a)(1)(B)(iii), (2)(A). On the day of some aliens' release from local custody, then, they become subject to immediate detention by ICE. Even if being subject to immediate detention under the INA is not deemed an "immigration status," it clearly is information "regarding" immigration status, for it is aliens' unlawful immigration status that makes them subject to immediate detention when released from state custody. Because the Act contravenes Plaintiffs' federal right to provide information on release dates, it is expressly preempted.

## VI. Plaintiffs have prudential standing to bring their intergovernmental immunity claim, and the Community Trust Act violates intergovernmental immunity.

Defendants claim that Plaintiffs lack prudential standing to bring their intergovernmental immunity claim because they are outside the "zone of interests" of the intergovernmental immunity doctrine. Defs' Br. at 19 ("[T]he legal interest [Plaintiffs] seek to enforce belongs to the United States, not to them."). Like government contractors, however, Plaintiffs, under federal law, may and do assist the federal government through their cooperation with federal immigration law enforcement, 8 U.S.C. § 1357(g)(10)(B), and Plaintiffs' interest in doing so is identical to the federal government's interest in their doing so: better, more efficient enforcement. This status as force multipliers for the federal government in enforcement, which makes Plaintiffs, like federal contractors, instrumentalities of the federal government, along with their identity of interest, places Plaintiffs squarely within the zone of interests protected by intergovernmental immunity.

As Plaintiffs argue in their opening brief, the Act places a severe burden on the federal government's choice to have a largely civil immigration system, in which judicial criminal warrants are not contemplated, by conditioning cooperation on the presentation of such a warrant. Pls' PI Br. at 26. This severe burden constitutes a regulation of the federal government. As the Third Circuit explained in holding that New Jersey's ban on immigration detention centers operated by federal contractors was a regulation of the federal government in violation of intergovernmental immunity:

> [T]he modern doctrine [of intergovernmental immunity] distinguishes between laws that merely impose an incidental economic burden on the federal government and those that subvert federal operations. The latter trigger immunity; the former do not. *See Taber v. Indian Territory Illuminating Oil Co.*, 300 U.S. 1, 3–4 (1937) (distinguishing a "nondiscriminatory" regulation "where there is only a remote, if any, influence upon the exercise of governmental functions" from "one which imposes a direct burden upon the exertion of governmental powers"); *Pub. Utils. Comm'n v. United States*, 355 U.S. 534, 543–44 (1958) (collecting cases and distinguishing between "nondiscriminatory state taxes on activities of contractors … who do business for the United States, as their impact at most is to increase the costs of the operation" and state laws that "place[] a prohibition on the Federal Government" by regulating third-party activity); *see also GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) (en banc) (noting this material distinction).

*CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 323-24 (3d Cir. 2025). Because the Act "subverts federal operations," "imposes a direct burden upon the exertion of governmental powers," and places a burden on the federal government by regulating third-party activity, it is a regulation of the federal government that violates intergovernmental immunity. *See* Pls' PI Br. at 21-25 (showing how the Act makes federal immigration law enforcement more difficult).

## VII. Plaintiffs have established irreparable harm.

If being forced to violate an oath of office is an Article III injury (and it is under *Allen*, 392 U.S. at 241 n.5), it is also ongoing irreparable harm, because it cannot be remedied by damages in a suit against the state. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable*

*Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.") (quotation omitted). The same is true of the loss of federal funding and the incurring of federal criminal liability. In short, the dilemma the Act places Plaintiffs in—fail to comply and face injunction suits from the Attorney General, or comply and suffer these other harms—is ongoing and not compensable, and thus imminent and irreparable.

## VIII. The balance of equities and the public interest mean that full preliminary injunctive relief is necessary and proper.

Defendants ask this Court to limit any potential relief to the named Plaintiffs. Defs' Br. at 30. To the extent the Court finds the Act to be preempted by federal law and therefore unconstitutional, it should instead enjoin the Act statewide. The Act seeks to—and if not enjoined will—hinder the vigorous enforcement of immigration law, which is necessary to protect the public from the danger of criminal aliens. Contrary to Defendants' assertion, *id.*, it is not "conjecture" to conclude that deporting criminal aliens from the country will enhance public safety in Maryland. This Court is empowered to grant any relief that is necessary or proper. 28 U.S.C. § 2202. Simply put, an injunction barring the enforcement of the Act statewide would be in the public interest because it would improve immigration enforcement against criminal aliens in the State of Maryland.

**CONCLUSION**

For the foregoing reasons, Plaintiffs motion for a preliminary injunction should be granted, and Defendants' motion to dismiss should be denied.

Dated: September 8, 2026

Respectfully submitted,

s/ Christopher J. Hajec
Christopher J. Hajec*
Matt A. Crapo*

s/ Mateo Forero-Norena
Mateo Forero-Norena (Bar No. 30768)

Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
chajec@fairus.org
mcrapo@fairus.org
mforero@fairus.org

* admitted *pro hac vice*

*Counsel for Plaintiffs*